## ALLEN v. SMITH.

## SMITH v. ALLEN.

ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.

Nos. 168, 176. Argued January 19, 1899. — Decided March 6, 1899.

The manufacturer of the sugar, and not the producer of the sugar cane, is the person entitled to the "bounty on sugar" granted by the act of March 2, 1895, c. 189, to "producers and manufacturers of sugar in the United States."

THIS was a controversy arising over the distribution of the estate of Richard H. Allen, a large sugar planter of La Fourche Parish, Louisiana, who died September 14, 1894, leaving a will of which the following clauses only are material to the disposition of this case:

"I give to my wife, Bettie Allen, one half of my Rienzi plantation and one half of all tools, mules, etc. The names of my executors, etc., will be named hereafter. My executors shall have from one to five years to sell and close up the estate, as I fear property will be very low and dull. They can sell part cash, part on time, eight per cent interest with vendor's lien. I will that my wife do have one half of everything belonging to Rienzi, except the claim due me by the United States; that and other property I will speak of further on. I appoint as my executors, Ogden Smith and W. F. Collins, residing on Rienzi plantation. I also appoint Mrs. Bettie Allen, executrix. I give them full power to sell Rienzi plantation whenever they find a good offer for all the property there belonging. When it is sold half of all the proceeds, cash, notes, etc., is to belong to my dear wife, Bettie Allen. The other half will be spoken of hereafter. As I fear property will be very low, I give my executors five years to work for a good price. In the meantime that they are waiting to sell, the place can be rented or worked so as to pay all taxes and other charges; any over that to go to Mrs. Bettie Allen's credit."

Letters testamentary were issued to William F. Collins, Ogden Smith and M. Elizabeth Greene, the widow, better known as Bettie Allen, who were authorized by special order to carry on and work the plantation, etc.

The executors did not agree as to the disposition of the estate; Mrs. Allen and Collins filing a provisional account of their administration and praying for its approval, while Smith filed a separate account, prayed for its approval, and stated that he disagreed with his coexecutors in several particulars, and therefore filed an account in which his coexecutors did not concur. The principal dispute seems to have been over the cash left by the deceased, which Mrs. Allen claimed under the will, and Smith insisted belonged to the legal heirs who

were not cut off by the will. Mrs. Allen also claimed the crop of the Rienzi plantation, while Smith insisted it belonged to the legatees named in the will, to whom the realty was bequeathed. Opposition to the approval of both accounts were also filed by various parties interested in the estate, and for various reasons not necessary to be here enumerated. Judgment was delivered by the district court, June 10, 1895, settling the questions in dispute between the parties interested, and an appeal was taken to the Supreme Court of Louisiana, which rendered an opinion March 9, 1896, varying the decree of the court below to the extent of holding Mrs. Allen entitled to the net proceeds of the crop for the year 1894, but affirming it in other respects. 48 La. Ann. 1036. No reference, however, was made in the proceedings up to this time to the Government bounty upon sugar, amounting to $11,569.35, which was collected by Mrs. Allen, and which forms the subject of the present litigation.

This suit was initiated by a petition filed August 18, 1896, by Collins and Mrs. Allen for the approval of their final account, and of the proposed distribution of the undistributed assets, among which was the bounty granted by Congress for sugar produced on the Rienzi plantation for the year 1894, the portion received, $11,569.35, being all that the estate was entitled to out of the appropriation made by Congress for this purpose. "This amount the accountants proposed to turn over to Mrs. Bettie Allen as the owner of the net proceeds of the crop of 1894 on the Rienzi plantation, under the will of the testator and the decree of the Supreme Court."

Smith also filed a final account and an opposition to that of Mrs. Allen and Collins, particularly opposing giving any part of the bounty to Mrs. Allen, stating that "this money formed no part of the crop of 1894, is an unwilled asset, and must be distributed among the legal heirs who have not been cut off by the will, in accordance with the petitioner's final account filed herewith." These heirs, as stated by him in his account, were (1) the estate of Thomas H. Allen, Sen., a deceased brother of the testator, represented by J. Louis Aucoin, administrator; (2) two children of Mrs. Myra Turner, a deceased

sister; (3) five children of Mrs. Cynthia Smith, a deceased sister. Opposition was also filed by these several classes of heirs to the accounts of Mrs. Allen and Collins, and by certain other heirs who were not recognized by the executors, to that of Smith. Upon consideration of these various pleadings and the testimony introduced in connection therewith, the district court was of opinion that the bounty formed no part of the crop proper or the proceeds thereof. "Though based on the crop as a means of calculation, and conditioned on the production of the crop by the owner of the plantation, under certain rules, it was a pure gratuity from the Government;" that it did not therefore go to Mrs. Allen under the will, but to the heirs as an unwilled portion.

An appeal was taken to the Supreme Court by the Smith heirs, by Ogden Smith, executor, and by Mrs. Allen and Collins. That court first held that the bounty was a gratuity from the Government, though based upon an estimate of the crop as a means of calculation; that its allowance was conditioned on the fulfilment by the deceased of certain prerequisites; that the equitable claim of the deceased to the bounty had been created during his lifetime, the license obtained and all conditions precedent complied with; that it formed no part of the crops of 1894 or 1895, nor of their proceeds; that the executors did nothing but make the necessary proofs preparatory to its collection and receive payment of the money. "It must consequently be classed as an unwilled asset of the deceased, and not as part of the net proceeds of the crop of 1894, passing, under the will, to Mrs. Bettie Allen;" and that it must pass to the account of the legal heirs. 49 La. Ann. 1096. Upon a rehearing, applied for by both parties, that court modified its views, and adjudged that the bounty money in controversy be divided equally; that one half be distributed among the heirs as an unwilled portion, and that the other half be delivered to Mrs. Allen as legatee. From this decree both parties sued out a writ of error from this court. 49 La. Ann. 1096, 1112.

*Mr. J. F. Pierson* for Mrs. Allen. *Mr. Charlton R. Beattie* and *Mr. Taylor Beattie* filed a brief for same.

*Mr. Albert P. Fenner* for Aucoin. *Mr. Charles E. Fenner, Mr. Samuel Henderson, Jr.,* and *Mr. Charles Payne Fenner* were on the brief.

*Mr. Henry Chiapella* for Turner and Smith. *Mr. L. F. Suthon* filed a brief for Smith's heirs.

MR. JUSTICE BROWN, after making the above statement, delivered the opinion of the court.

This case involves the question whether, under the act of Congress and the will of Richard H. Allen, the bounty of eight tenths of one per cent per pound, granted by Congress to the "producer" of sugar, was payable to his widow or to his heirs at law.

In the course of the litigation in the state courts a large number of questions were raised and decided which are not pertinent to this issue. So far as these questions depend upon the construction of state laws or of the will of Mr. Allen, they are beyond our cognizance. So far as the question of bounty depends upon the construction of that law, the decision of the Supreme Court is equally binding upon us; but so far as it depends upon the construction of the act of Congress awarding such bounty, it is subject to reëxamination here.

The course of legislation upon the subject of the sugar bounty is set forth at length in the opinion of this court in *United States v. Realty Co.,* 163 U. S. 427, and is briefly as follows:

By the tariff act of October 1, 1890, c. 1244, 26 Stat. 567, it was provided in paragraph 231 that on and after July 1, 1891, and until July 1, 1905, there should be paid "to the producer of sugar" a variable bounty, dependent upon polariscope tests, "under such rules and regulations as the Commissioner of Internal Revenue . . . shall prescribe." Then follow three paragraphs requiring the producer to give notice to the Commissioner of Internal Revenue of the place of production, the methods employed, and an estimate of the amount to be produced, together with an application for a license and an accompanying bond. The Commissioner was required to issue

this license, and to certify to the Secretary of the Treasury the amount of the bounty for which the Secretary was authorized to draw warrants on the Treasury. This act was repealed August 27, 1894, c. 349, 28 Stat. 509, while the crop of 1894 was in progress of growth, and about a fortnight before the death of Mr. Allen. But by a subsequent act of March 2, 1895, c. 189, 28 Stat. 910, 933, it was enacted that there should be paid to those "producers and manufacturers of sugar" who had complied with the provisions of the previous law a similar bounty upon sugar manufactured and produced by them previous to August 28, 1894, upon which no bounty had been previously paid. As the sugar in question in this case was not manufactured and produced prior to August 28, 1894, this provision was not applicable; but there was a further clause (under which the bounty in this case was paid) to the effect that there should be paid to "those producers who complied with the provisions" of the previous bounty law of 1890, by filing an application for license and bond thereunder required, prior to July 1, 1894, and who would have been entitled to receive a license as provided for in said act, a bounty of eight tenths of a cent per pound on the sugars actually manufactured and produced during that part of the fiscal year ending June 30, 1895, comprised in the period commencing August 20, 1894, and ending June 30, 1895, both days inclusive. The constitutionality of this act was affirmed by this court in *United States* v. *Realty Co.*, 163 U. S. 427.

At the time of Mr. Allen's death, September 19, 1894, and for many years prior thereto, he was the owner of a valuable sugar plantation, upon which he was engaged in the cultivation of cane and the manufacture of sugar. At this time there was standing in his fields a large crop of cane nearly ready for harvesting. In anticipation of this crop and of the manufacture of sugar therefrom, Mr. Allen had complied with all the provisions of the bounty law, and would, but for the repeal of the act of 1894, about one month prior to his death, have been entitled to collect the bounty. While, then, there was no bounty provision in force at the time of his death,

Congress, in March of the following year, enacted the bounty law above specified in fulfilment of its moral obligation to recompense those who had planted their cane upon the supposition that the bounty granted by the act of 1890 would be continued. The crop of cane upon his plantation at his death was harvested by his executors at the expense of the funds in their hands, which expense was deducted from the gross proceeds of the sugar.

The material provisions of his will are as follows :

1. "I give to my wife, Bettie Allen, one half on my Rienzi plantation and one half of all tools, mules, etc."

2. "My executors shall have from one to five years to sell and close up the estate."

3. "I will that my wife do have one half of everything belonging to Rienzi plantation, except the claim due me by the United States." (This was not the claim for bounty.)

4. "When it" (the plantation) "is sold half of all the proceeds, cash, notes, etc., is to belong to my wife, Bettie Allen." "As I fear property will be very low, I give my executors five years to work for a good price."

5. "In the meantime, that they are waiting to sell, the place can be rented or worked to pay all taxes and other charges, any over that to go to Mrs. Bettie Allen's credit."

Under the last clause of the will the executors, while awaiting a favorable opportunity to sell the plantation, were authorized to work it so as to pay all taxes and other charges, and to place the net proceeds to Mrs. Allen's credit. In construing this clause the Supreme Court of Louisiana held, upon the first hearing, 48 La. Ann. 1036, that Mistress Bettie was entitled to the net proceeds of the crop of the Rienzi plantation for the years 1894–1895. At the time of the filing of their first account by the executors, the crop of 1894 had not been sold by them, and the bounty granted by the act of March 2, 1895, had not been collected ; consequently these two items were reserved to be afterwards accounted for by the executors. A further question, however, arose, and that was as to whether, in making up the net proceeds of the crop of 1894, the expenses incurred prior to the death of the tes-

tator should be deducted, as well as those incurred by the executors after the death of the testator. Both the district court and the Supreme Court were of opinion that the will contemplated and dealt with the renting or cultivation of the plantation after the death of the testator, and during such a period of time as it might remain under the administration of the executors pending a sale; that the date at which the expenses were to begin was evidently that at which the administration of the executors commenced, and only those incurred during their administration should be deducted from the proceeds of the crop, in order to ascertain the net proceeds thereof, including the expenses of making the sale. 49 La. Ann. 1096.

The Supreme Court was further of the opinion that the bounty money which was collected from the Government by the executors formed no part of the crops of 1894 and 1895, nor of their proceeds; that it was not *in esse* at the time those crops were grown and gathered; that the executors did nothing but make the necessary proofs preparatory to its collection and received payment of the money, and that it should therefore be classed as an unwilled asset of the deceased, and not as part of the net proceeds of the crop of 1894, passing, under the will, to Mrs. Allen. 49 La. Ann. 1096. But, upon a rehearing of this question, 49 La. Ann. 1112, the Supreme Court modified its views to a certain extent, treated the case as one depending upon the question who was the producer of the crop within the meaning of the act of Congress, and held that the producer of the cane was to be the first to receive the benefit of the bounty on complying with certain formalities; that the act placed the manufacturer of the sugar, in the matter of the bounty laws, in a secondary position; but that both production and manufacture were essential in order to enable the producer to recover the bounty; that to determine who was the producer it was necessary to consider the questions of title and ownership; that the crop had been planted and cultivated by Allen, and all expenses to the date of his death were paid from his funds; that he had earned the value of the crop on that date,

and had also earned a proportionate share of the bounty, not because the bounty was a part of the crop or its proceeds, but because it was granted to the producer of the crop; that in determining who was the producer, it could not exclude from consideration the labor applied under the direction of the owner of the plantation and the amount expended by him; that Mistress Bettie was not the exclusive producer, and was, therefore, not entitled to the whole bounty of the Government granted to the producer who produced the entire thing — a crop.

In its opinion upon the rehearing the Supreme Court adjudged that under the will of Allen the proceeds of the manufacture of sugar carried on after his death were for the account of Mrs. Allen and not for that of the estate, and that as a consequence of this construction Mrs. Allen was the manufacturer of the sugar made in the sugar house; that is to say, that whilst the executors may have manufactured the sugar they did so as the agents and for the account of Mrs. Allen, and she was therefore the producer of the sugar, in so far as the manufacture thereof was concerned. In delivering the opinion the court used the following language: "But there are other clauses of the will which, in our view, extend her right and show that she was the producer after the death of Mr. Allen. She paid all the expenses of the crop; she was to receive the proceeds under the terms of the will; indeed, she was the owner of the crop. She can well be considered, as we think, the producer. We desire it to be well understood that, in our opinion, the bounty money is no part of the crop or proceeds of the crop. The question was: Who was the owner and producer of the crop after the death of the testator?"

Having thus determined that under the will of Mr. Allen she, through the executors, was entitled to all the proceeds of the manufacture of sugar in the sugar house, the court proceeded to take away from Mrs. Allen a part of these proceeds upon the theory that, by the act of Congress, the bounty was given, not to the manufacturer of the sugar, but to the producer of the cane. In doing this it necessarily took from Mrs.

Allen a part of the bounty belonging to her as manufacturer of sugar under the act of Congress, and gave it to the legal heirs of Allen, because they had produced the cane from which the sugar had been manufactured. This, therefore, necessarily raised a Federal question, since it involved a construction of the act of Congress. The theory upon which the court did this is thus stated in the opinion: "The end of the bounty was to encourage the production of cane. It devolved upon us to determine by whom the cane was produced. In our judgment, after carefully reading the act, it is evident that the producer was to be the first to receive the benefit of the bounty. . . . . The act (although it includes the manufacture of cane into sugar as one of the essentials) places the manufacture of the sugar in matter of the bounty scheme in a secondary position. In other words, in our view production was a first and manufacture a secondary consideration. Each, however, was essential in order to enable the producer to recover the bounty." The conclusion of the court was that, as the cost of cultivation was about equal to the cost of manufacture, the heirs at law were entitled to one half of the bounty and Mrs. Allen the other half.

The correctness of this construction is the question presented for our consideration. In the final production of sugar there are two distinct processes involved: (1) The raising of the cane; (2) the manufacture of the sugar from the cane so raised. If the cane be raised and the sugar be manufactured by the same person, he is beyond peradventure the "producer" of the sugar within the meaning of the statute; but if the cane be raised by one person and the sugar manufactured by another, which is the producer within the intent of the act? Or, if, as in this case, the cane be raised by the testator and he die while the crop is growing, and his executors reap it and convert it into sugar, which is the producer and which is entitled to the net proceeds of the crop? Conceding the question of what are the net proceeds of the crop is one determinable by the state courts alone, it is so commingled with the Federal question, who, under the act of Congress, was the producer of this crop, that it is scarcely possible to give a construction to the

·one without also taking into consideration the bearing of the · other. In this particular the case is not unlike that of *Briggs* v. *Walker*, 171 U. S. 466, in which, where certain moneys· had been collected of the United States by Briggs' executors, this court assumed to determine who were the · " legal representa- ‚ tives " of Briggs, and for whose benefit under the act of Con- gress the money had been collected. ·

It is quite evident that Allen himself was not the producer of the sugar. He had planted the crop of cane upon his own plantation. He had given notice and a bond to the Commis- sioner of Internal Revenue, and had applied for a license;· but he had done nothing toward the production of ·the sugar at the time of his death beyond raising the cane, which certainly would not have entitled him to be considered a producer of the sugar. The word " producer " does not `differ essentially in its legal aspects from the word " manufacturer," except that it is more commonly used to denote a person who raises agri- cultural crops and puts them in a condition for the market. In the case of sugar a process of strict manufacture is also ·in- volved in converting the cane into its final product. In a num- ber of cases arising in this court under the revenue laws, it is said that the word " manufacture " is ordinarily used to de- note an article upon the material of which labor has been ex- pended to make the finished product. That such product is often the result of several processes, each one of which is a separate and distinct manufacture, and usually receives a sepa- rate name; or, as stated in *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 216: "Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, and several of which may be re- quired to make the final product.] Thus logs are first manu- factured into boards, planks, joists, scantling, etc., and then by entirely different processes are fashioned into boxes, furni- ture, doors, window sashes, trimmings and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for

which the article so manufactured receives a different name." So the one who raises the cane is undoubtedly entitled to be considered the producer of the cane, but he is not the producer of the sugar. That appellation is reserved for him who turns out the finished product.

Neither can Mrs. Allen, nor the heirs of her husband, be said to be the direct producers of the sugar. Neither of them was the owner of the crop, which belonged to the plantation while growing, and would, as hereinafter stated, have passed to the purchaser, had a sale been made while the cane was still uncut. One half of the plantation passed under the will to Mistress Bettie, and the other half to the heirs of her husband.

There remain only the executors who, as between the estate of Allen and the Government, must be deemed the producers of the sugar. By the will they were authorized to rent or work the plantation as they pleased, to pay all taxes and other charges, and to put the residue to the credit of Mrs. Allen. The inchoate right to the bounty obtained by Allen before his death was a personal asset, which undoubtedly passed to the executors, who subsequently perfected that right and received the money.

Of course this money did not belong to the executors personally. They held it for the benefit of the estate and as agents for all persons interested therein; and the question as between the different heirs and legatee who shall be deemed the producer of the sugar remains to be settled. We are all of opinion that this question must be answered in favor of Mistress Bettie. If the cane when cut had been sold, the proceeds, over and above all expenses incurred since her husband's death, would have belonged to her, but not the bounty *eo nomine*, since the sugar had not been produced nor the bounty earned. But if such sale had been made, the cane undoubtedly would have fetched a price largely increased by the fact that the purchaser would receive a bounty upon the manufacture of the sugar. It is impossible to suppose that the price of the cane would not be seriously affected by the promise of the bounty, though perhaps not to the full amount of such

bounty. In this way Mrs. Allen would have received indirectly the benefit of the bounty, although she did not produce the sugar. On the other hand, if the cane be converted into sugar, it is equally just that she should receive the bounty. To deny it to her would place her in a worse position than she would have been in if the executors had sold the cane when it was cut. Whether she received it directly or indirectly makes no difference in principle.

The difficulty with the position of the Supreme Court of Louisiana is this: That if A should raise the cane and sell it to B, who manufactured it into sugar, A and B would be entitled to share in the bounty, although A may have received a much larger price for his cane than he would have received if there had been no bounty. Under the terms of the will Mistress Bettie was entitled to receive the entire proceeds of the crop, over and above the expenses, taxes and other charges; and whether these came from a price received from the cane increased by the offer of a bounty, or from the bounty actually received upon the production of the sugar, is wholly immaterial. To give to one who raises the cane and sells it to a manufacturer any part of the bounty, is in reality to give him a double bounty, since he must necessarily receive one in the enhanced price given for the cane. On the other hand, the manufacturer of the sugar is entitled to the proceeds of his sugar and to whatever the law has annexed thereto as an incident.

To return to the illustration of manufactures. Can it be possible that, if a bounty were offered for the manufacture of furniture, the manufacturer of the finished product would be obliged to share such bounty with the owner of the trees, or the manufacturer of the lumber cut from such trees, from which the furniture was made? Or, under similar circumstances, would the manufacturer of watches be compelled to share the bounty with the scores of prior manufacturers who contributed directly or indirectly to the production of the various articles of mechanism which go to make up the finished watch? To state this question is to answer it; and yet, if the producer of the cane be entitled to any portion of the

bounty, why are not the manufacturers of the constituent parts of a finished product?

The Supreme Court of Louisiana held that the widow was not chargeable with any part of the expense of the crop incurred prior to her husband's death, but that does not change her attitude to the sugar as its actual producer, nor deprive her of the benefit of the bounty; nor do we think that her right to such bounty is affected by the fact that the bounty law in existence when Allen applied for his license was repealed before his death, and another law passed in the following spring renewing the bounty applicable to the crop of the previous year. Such act was passed, as was held by this court, in *United States* v. *Realty Co.*, 163 U. S. 427, in recognition of a moral obligation to those who had put in their crop the previous year upon the faith of the bounty law then in existence. It was not so much a gift by the Government as a reward paid in consideration of expenses incurred by the planters upon the faith of the Government's promise to pay a bounty to the manufacturers and producers of sugar. As applied to this case, we think the act of 1895 should be construed as a continuation of the prior bounty. To say that it is an "unwilled asset" is practically to hold that it is a gift from the Government "without anything in the nature of a consideration," and that the amount of sugar produced is only to be considered as the measure of the bounty. This dissociates the bounty altogether from the motive which actuated Congress in granting it, and turns it into a mere donation of so much money, which it cannot be presumed to have made, even if it had the power. Bounties granted by a government are never pure donations, but are allowed either in consideration of services rendered or to be rendered, objects of public interest to be obtained, production or manufacture to be stimulated, or moral obligations to be recognized. To grant a bounty irrespective altogether of these considerations would be an act of pure agrarianism; and to determine who is entitled to the benefit of the bounty is but little more than to determine who has rendered the consideration.

The act giving the supplementary bounty to replace that which should have been paid under the original act clearly did not contemplate giving a bounty to any other producer than the one designated by the original act. That act plainly gives the bounty only to the manufacturer and not to the grower. It follows, therefore, that the court, accepting its construction of the will as unquestionable, declared that although Mrs. Allen was a manufacturer of the sugar and the successor of Mr. Allen in that regard, was yet not entitled to the whole bounty, because, under its construction of the act of Congress, the grower of the cane was the primary person intended to be benefited by the act. As it is obvious that the person intended to be benefited by the act of Congress was the manufacturer, it follows that the Supreme Court of Louisiana, after finding that Mrs. Allen was the manufacturer, has taken from her a portion of the bounty to which she was entitled under the act of Congress, on the erroneous theory that that act gave the bounty to the grower of the cane instead of to the manufacturer.

We do not undertake to say that the crop of growing or maturing cane passed to Mrs. Allen at the date of her husband's death, since if the executors had chosen to sell the plantation the next day, this cane would have passed to the vendee. In this the common law and the civil law agree. (1 Washb. on Real Prop. 5th ed. 11; Code Napoleon, art. 520.) The same principle is incorporated in the Civil Code of Louisiana: "Art. 465. Standing crops and the fruits of trees not gathered, and trees before they are cut down, are likewise immovable, and are considered as part of the land to which they are attached. As soon as the crop is cut, and the fruits gathered, or the trees cut down, although not yet carried off, they are movables." But what she did own was the proceeds of the crop; the right in case the plantation was not sold to have this crop harvested for her benefit, and if manufactured into sugar, to have the proceeds of such sugar and all the incidents thereto placed to her credit.

For the reasons above given, we think she must be considered as the producer of the sugar, and that it is immaterial that she

was not the producer of the cane, since the two are distinct and separate articles of production.

*It results from this that the decree of the Supreme Court of Louisiana must be reversed, and the cases remanded to that court for further proceedings in consonance with this opinion.*