UNITED STATES v. LEONARD et al.

(Circuit Court of Appeals, First Circuit. April 12, 1901.)

No. 364.

CUSTOMS DUTIES—CLASSIFICATION—WOOL GREASE.

Substances obtained by washing the solid residuum left after the distillation of wool grease, known as "hard yellow grease" and "white grease," which are of a yellowish color, and have the consistency of a hard cake, being in truth and substance wool grease, though not included in what is commercially known as such, are dutiable as "wool grease," under paragraph 279 of the customs act of 1897, providing for a duty on "wool grease, including that known commercially as degras or brown wool grease," and they are not entitled to free entry under paragraph 568.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

For opinion below, see 100 Fed. 288.

Albert H. Washburn, Asst. U. S. Atty. (Boyd B. Jones, U. S. Atty., on the brief).

Howard T. Walden, for appellees.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. This appeal relates to the construction and application of paragraphs 279 and 568 of the customs act of 1897, as follows:

"(279) Tallow, three-fourths of one cent per pound; wool grease, including that known commercially as degras or brown wool grease, one-half of one cent per pound."

"(568) Grease, and oils (excepting fish oils), such as are commonly used in soap making or in wire drawing, or for stuffing or dressing leather, and which are fit only for such uses, and not specially provided for in this act."

Unfortunately, the record does not contain the invoices; but we gather from it that the importation was invoiced partly as "hard yellow grease," and partly as "white grease." How much there was of each, we are not advised. It is enough, perhaps, to remark that neither party seems to claim any substantial distinction, and what we find in the record in reference thereto is that the "white grease" is the "hard yellow grease" bleached.

The controversy originated at the port of Boston, where the collector classified the entire importation as "wool grease." The record shows that "hard yellow grease" had been imported at Boston for some time, and always classified as "wool grease." It was also testified by Mr. Hopkins that it was classified under the customs act of 1894 as "wool grease, free."

Wool grease and its origin are perhaps best described by the following extract from a technical work published in London, cited by the United States:

"Wool fat is the natural grease contained in sheep's wool. In the course of preparing the raw wool for spinning, this grease is removed by means of dilute soap (or sodium carbonate) solutions, or by extraction with volatile solvents. In this country the suds from wool scouring are collected in large

tanks, and, by acidulating with mineral acids, 'brown grease' or 'recovered grease' is obtained, of varying composition, according as the suds from the wool are kept separate, or are mixed with the soap suds from the scoured woven goods, as is the case in those woollen mills where wool is washed, spun, and woven."

The word "degras," found in paragraph 279, has had, to some extent, a generic meaning, and is not always limited to wool grease or its products; but, in the trade of the United States, "degras" and "brown grease," found in that paragraph, have now like signification, and each is the equivalent of what is known commercially as "wool grease." Indeed, the proofs show that, in trade, "degras," "brown wool grease," and "wool grease" have an identical meaning, although "degras" or "wool grease" is not always brown. There is no suggestion to the contrary in the record; and this is an important fact to be considered, because it determines that in construing paragraph 279 we must understand the words "including that known commercially as degras, or brown wool grease," to cover all "wool grease" as known in the trade at the time of the passage of the act of 1897.

The United States claim that the imports under consideration are the residuum of the distillation of the suds to which we have referred, that what goes over in the distillation becomes what is ordinarily known in trade as "wool grease," and that the residuum is truly and substantially wool grease, and nothing else. It may well be said that this is not controverted by the importers, and that they rest their case on the proposition that, although the residuum is wool grease, yet it is not the wool grease known to trade. They are supported in this proposition by the testimony of Mr. Webster, an examiner in the United States appraiser's office at New York, who was called in behalf of the United States before the appraisers. He said that he was not acquainted with the articles in controversy here, that he should not consider them to be what is known commercially as "wool grease," and that they differ from what is so known, in color and in viscosity, and are hard substances, while what is known as "wool grease" is more of the consistency of molasses or soft lard. Mr. Leonard, one of the importers, also testified that the articles in controversy would not be a good delivery for what is known in trade as "wool grease." On the other hand, it is clear they have never received a commercial designation within the rules pertinent thereto which concern the construction of customs acts. It appears by the testimony of Mr. Leonard that the quantity produced is small, and that the importers in this case have the exclusive control of it in this country. It also appears that they invoice it as "hard yellow grease" and as "white grease"; but, on the other hand, it appears, as we have seen, that until this controversy arose it was always classified at the customs in Boston as "wool grease."

If the article had a commercial designation, differing from the expression "wool grease," this, by the well-settled rule, would have very great weight in determining the question before us, and might compel an application of paragraph 279 different from that which we must give it. But it is, of course, apparent that it is not to be

expected that any so-called commercial designation is within the contemplation of congress in enacting a customs act, unless it has in some way obtruded itself upon public attention. We have the subordinate rule, restated in Sonn v. Magone, 159 U. S. 417, 420, 421, 16 Sup. Ct. 67, 40 L. Ed. 203, that a commercial designation is not to prevail unless it appears that it is the result of established use in commerce, and that such use is definite, uniform, and general in the trade, and not partial, local, or personal. Therefore, on the most favorable view of the facts which can be taken for the importers on this appeal, it is apparent that there is nothing in these rules of interpretation which can assist them, in view of the peculiar phraseology of paragraph 279, which we will consider later.

Coming now more closely to the substantial character of the importations, we find the testimony of Mr. Hopkins, who is a special examiner of drugs and chemicals in charge of the United States laboratory at Boston, which is in no way contradicted. He testified that, on the distillation of which we have spoken, a yellow wool grease comes over, and a yellow residue is left in the kettles, and that this residue is still wool grease, as is proven by its analysis by chemical tests and distillation by superheated steam. Referring to this fact, Charles S. Bush, who is engaged in this trade and in kindred merchandise, testified that his concern had been making laboratory experiments with superheated steam, trying to break up "degras or wool grease," and that they have never succeeded in doing so. Mr. Leonard also described the entire operation and its commercial effect quite clearly, showing that the importation is a certain residuum, that it had been considered of no special value until finally brought up and washed, that "yellow grease" and "white grease" are a little higher than "ordinary degras or wool grease," and that it is higher in price on account of its hardness, and because it has uses as hard grease. But there seems to be no particular difference on this point, the importers resting their case on the contention that, whatever the articles are in truth and substance, they are not "wool grease" as known to the trade; and we have gone into this fully in order only that the true nature of the imports may be better explained. The result is that what comes over from the distillation is, both in the trade and in truth, wool grease; that the residuum has not been known in the trade as "wool grease," but that it is in fact wool grease, and is used for the same purpose as what comes over,—that is, for stuffing leather.

Indeed, the importers, in order to bring their case within paragraph 568, must and do rest it on the proposition that their imports are truly and substantially grease, and are used for stuffing or dressing leather. Being grease, it is, from the very nature of the thing, in truth, wool grease, and it can be nothing else. Therefore the importers necessarily agree with the proposition of the United States that the substance of the residuum is, in truth, the same as the substance of the distillate known in the market as "wool grease," and that it has not been changed by the distillation or the subsequent washing and pressing. It follows that it comes precisely within

the letter of paragraph 279, and it can be excepted from it only on one of two theories: One is that it has a definite trade designation, which is not "wool grease," which, under the rules given by the supreme court, we have shown, is not the fact; and the other is that the term "wool grease," in paragraph 279, is limited to "wool grease" known to the trade, so that it includes no imports which are not so known, like those in question here. This is met by the clear phraseology and intent of paragraph 279. We have already shown that the expression contained therein, "degras or brown wool grease," covers all the wool grease known to the trade. Therefore, inasmuch as, by the very terms of paragraph 279, the general expression "wool grease" is stated to include what is commercially known as "wool grease," the paragraph can have no construction except a generic one, so as to cover everything which is, in truth and in substance, wool grease, and which is not definitely known to the trade under some other name. As these imports are not so known, it follows that they are within the meaning which must be given to the expression "wool grease" as found in this paragraph.

The importers rely on Smith v. Rheinstrom, 13 C. C. A. 261, 65 Fed. 984, decided by the circuit court of appeals for the Sixth circuit; Movius v. U. S. (C. C.) 66 Fed. 734, affirmed, under the title of Morris v. U. S., 24 C. C. A. 685, 79 Fed. 999, by the circuit court of appeals for the Second circuit; and Apgar v. U. S., 24 C. C. A. 113, 78 Fed. 332, decided by the circuit court of appeals for the Seventh circuit. All of these cases, however, belong to the class of custom decisions having reference to an article which has been advanced by a process of manufacture or compounding, or the equivalent thereof; and they fall within the discussions relating to such advanced articles in Tide-Water Oil Co. v. U. S., 171 U. S. 210, 18 Sup. Ct. 837, 43 L. Ed. 139; Allen v. Smith, 173 U. S. 389, 19 Sup. Ct. 446, 43 L. Ed. 741; and U. S. v. Dudley, 174 U. S. 670, 19 Sup. Ct. 801, 43 L. Ed. 1129. What we have to deal with on this appeal, so far from being preparations or compounds, would, if the statute left the question an open one, be more properly solved by the decisions relating to residuum or other waste. However, this particular topic is disposed of by what we have already said, to the effect that the articles imported are, in truth and substance, wool grease, and have no trade designation, within the rule which we have given, while paragraph 279 is expressly framed to cover wool grease in its broadest sense.

In conclusion, while the articles imported cannot be held to be "wool grease," as the expression is commonly understood in the trade yet they are, in truth and substance, wool grease. They have no specific trade designation within the rules which we have stated, and paragraph 279 is specifically expressed to cover all wool grease which is, in truth and substance, such, and which has not some peculiar commercial designation.

The judgment of the circuit court is reversed, and the case is remanded to that court for further proceedings in accordance with law.