ROLLAND FRERES, INC. *v.* UNITED STATES (No. 3859)[1]

[1] T. D. 47763.

United States Court of Customs and Patent Appeals, June 10, 1935

*James W. Bevans* for appellant.
*Joseph R. Jackson,* Assistant Attorney General (*Charles D. Lawrence,* Special Assistant to the Attorney General, and *Marcus Higginbotham, Jr.,* special attorney, of counsel), for the United States.

[Oral argument April 16, 1935, by Mr. Bevans and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, First Division, one judge dissenting, which overruled appellant's protest against the decision of the collector disallowing drawback. The collector's decision was made in conformity with rulings of the Bureau of Customs of the Treasury Department. Our decision of the issue presented involves a construction of section 313, Tariff Act of 1922, reading, in part, as follows:

SEC. 313. That upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties  *  *  *.

Appellant imported into this country in 1928 and 1929 ladies' plain, unembroidered dresses and paid the duty thereon. Subsequently the imported dresses, at appellant's request, were embroidered by the Majestic Embroidery Co. of New York. After being embroidered they were redelivered to appellant and were exported. Appellant claims drawback in the amount of 99 per centum of the duties paid. The question presented here is whether or not the exported articles had been "manufactured or produced in the United States with the use of imported merchandise."

No samples showing or illustrating the dresses as imported or as exported were before this court or the trial court. It is stated in the record that the appellant was the importer of ladies' dresses which it sells in this country, and that the dresses at bar were not brought in as models but were selected from a stock of imported dresses, and the degree and style of embroidery, as well as the ornamentation on the dresses, was suggested by appellant's representative. The record is not very complete as to just how much embroidery was placed upon the dresses or the effect it gave to the same. It does appear, however, that the embroidery in each instance was made to harmonize with the dress and that the dresses were so treated with a view of increasing

their attractiveness. Whether their foreign-market value had been increased or their suitability for sale abroad had been advanced is not shown.

Adolph Steinberg, owner of the Majestic Embroidery Co., stated that he had been engaged in the embroidery business for about twenty years, and while some of his statements contradict others, we think his testimony shows that most of his business is in embroidering articles for domestic consumption and that he also does work for firms who export with the view of obtaining drawback. The witness Steinberg testified, in part, as follows:

Q. And did that embroidery differ in any way from that which you habitually apply to dresses?—A. Each and every garment differs, the one from the other; you never find two styles alike.

\* \* \* \* \* \* \*

Q. And in what manner; that is, what was the character of the embroidery?— A. The character of the embroidery was rayon, or viscose, we call them.

Q. And where was it applied?—A. According to the dresses; some dresses on the upper front, and some dresses had sleeves embroidered.

\* \* \* \* \* \* \*

Q. You have stated that some of the dresses, I believe, were embroidered around the front, you say?—A. Front and neck. The entire front of the dress, and also around the necks.

Q. And others were embroidered how?—A. Also front and sleeves.

Q. And was that embroidery in colors?—A. In colors, yes.

Q. And were the colors in harmony with it?—A. With the material?

Q. With the coloring of the dress?—A. With the coloring or material, it is, usually.

\* \* \* \* \* \* \*

X Q. Now, this embroidery—how much of it went around the neck?—A. What do you mean? "How much"?

X Q. Half an inch; a quarter of an inch; all the way around; or what?—A. The neck is usually considered 4 inches.

X Q. I don't want to know what it is usually considered. What do you do?— A. Four inches.

X Q. And down the front—how much of that?—A. Down the front it usually extended about 9 inches wide and 14 to 16 inches in length.

X Q. And how about the width?—A. The width is 9 inches in front.

X Q. You mean to say 9 inches wide?—A. Yes.

X Q. And how long? How far down?—A. 12 to 16 inches; the maximum number is 16.

X Q. And this embroidery around the sleeves?—A. The entire sleeve.

X Q. The entire sleeve, from shoulder down, all embroidered?—A. Yes.

X Q. Underneath too?—A. Well, we allow a certain amount.

X Q. Now you are testifying from your own personal knowledge?—A. My own personal knowledge, yes.

X Q. Or just guessing?—A. My own personal knowledge from 25 years in the trade.

X Q. You mean to tell us you took and embroidered the entire sleeve of each dress?—A. Yes, with a special machine made for that purpose.

Although the trial court ruled that the embroidered designs which had been furnished in the embroidery work on the exported merchandise would be the best evidence, such designs were not introduced.

Appellant has filed a very elaborate brief which discusses many authorities, reviews the history of the provision and related provisions and, among other things, contends here that the majority of the trial court was in error in holding that the exported dresses had not been *manufactured or produced with the use of imported merchandise* for the reasons first, that they had been *manufactured*; second, that if for any reason they could not be held to be *manufactured* the court should have held that they had been *produced*; that the legislative history · of the new language used in connection with the word "produced" in the tariff act of 1913 (same language used in Tariff Act of 1922) shows clearly that Congress meant to broaden the scope of the provision and to permit the exportation of goods "produced" in this country which technically might not have been "manufactured"; that for tariff duty purposes Congress has distinguished between plain wearing apparel and embroidered wearing apparel and that, therefore, the "production" of an embroidered dress by the use of an imported plain dress, by American labor, brings the transaction within the meaning of the controverted provision in letter and in spirit; that it is immaterial whether the embroidery was done for the purpose of enabling appellant to sell its dresses in France or whether it was done with a view of obtaining 99 per centum of the duty paid. Appellant also stresses legislative approval of administrative practice and cites a list of drawback rates established by the Treasury Department which, it contends, shows a consistent interpretation of the drawback provisions of various tariff acts and that the labor required to be performed upon the merchandise set out in the list was not as extensive as that done on the instant merchandise, and that, in many instances, cleaning and washing the imported articles had been held to be sufficient.

In this court, appellant's counsel has argued to the effect that if any manufacturing effort is expended upon an imported article, it is sufficient to comply with the provisions of the statute. He stated, and we think correctly, that it was not necessary for him to go as far as the last stated contention would lead in order for his position to be sustained in the instant appeal. He gave as an example of an article which should be regarded as having been *manufactured or produced* in this country in accordance with the terms of the statute, an imported, rough, copper engraving plate which had been ground and polished in this country.

The Government contends, and the trial court held, that while the embroidering might involve manufacturing processes, finished dresses were imported and finished dresses in the form, shape and size in

which they entered the United States were exported and that they had not been manufactured or produced so as to meet the requirements of the statute. In the brief of the Assistant Attorney General there is a list of Treasury decisions which held certain work performed on imported articles not sufficient to meet the requirements of the statute.

The trial court cited and quoted from the decision of this court in *Pelz-Greenstein Co.* v. *United States*, 17 C. C. P. A. (Customs) 305, T. D. 43718, evidently for the purpose of establishing that it was the duty of the importer to bring himself within the letter and spirit of the law and that doubt should be resolved in the favor of the Government, and not for the purpose of indicating the degree and character of labor which must be performed upon the exported article, since the majority opinion in that decision made no finding on that question. In that case the dress models were entered under bond under section 308, Tariff Act of 1922. This court held that such merchandise, entered under such circumstances, was not of the character of imported merchandise to which Congress referred in section 313. Two of the judges of this court specially concurred on the theory that the processes applied to the dresses did not constitute such a manufacture as was required by section 313. We can not see where this case has any bearing on the determination of the issue here involved unless it be upon he burden placed upon the appellant in the case at bar.

The case of *United States* v. *Adolphe Schwob, Inc.*, 21 C. C. P. A. (Customs) 116, T. D. 46447, involved drawback claimed under section 313, Tariff Act of 1930, in connection with watches which had been manufactured or produced in this country with the use of imported watch movements and watch cases not assembled when imported. In that case it appeared that the imported goods were exported for the purpose of obtaining drawback. We held there that it was immaterial whether the manufacturing effort had been or had not been expended for the purpose of so processing the goods as would make them respond to the terms "manufactured or produced" and thereby obtain 99 per centum of the duties paid. The question there was and here is: Does the record show that the exported articles had been manufactured or produced in the United States with the use of imported merchandise?

We adhere to our views in that case. In that case, and in this case, much was said about the unsuccessful attempt of the Treasury Department to get Congress in the Tariff Act of 1930 so to frame the provision that drawback would not be allowed where the manufacturing effort had been expended for the sole purpose of obtaining drawback. This was a proper matter for consideration in construing section 313 of the Tariff Act of 1930, but we are unable to see its relevancy in construing the same language in the Tariff Act of 1922.

Among the decisions relied upon by the trial court is that of *Anheuser-Busch Association* v. *United States*, 207 U. S. 556. In that case the drawback provisions of section 25 of the tariff act of 1890, which contained the following language, were involved:

That where imported materials on which duties have been paid, are used in the manufacture of articles manufactured or produced in the United States, there shall be allowed on the exportation of such articles a drawback equal in amount to the duties paid on the materials used, less one per centum of such duties. *Provided*, That when the articles exported are made in part from domestic materials, the imported materials, or the parts of the articles made from such materials shall so appear in the completed articles that the quantity or measure thereof may be ascertained. * * *

Certain corks were imported from Spain and after being processed in a certain manner were used by the Anheuser-Busch Association in bottling its beer, which bottled beer was exported. The drawback claim was predicated upon the duty paid on the corks. In deciding' the case, the Supreme Court of the United States said:

* * * The words of the statute are indeed so familiar in use and of meaning that they are confused by attempts at definition. Their first sense as used is fabrication or composition—a new article is produced of which the imported material constitutes an ingredient or part. When we go further than this in explanation we are involved in refinements, and in impracticable niceties. Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in Hartranft *v.* Wiegmann, 121 U. S. 609. There must be transformation; a new and different article must emerge, ''having a distinctive name, character or use.'' This cannot be said of the corks in question * * *.

We think that the language used in the decision in the *Anheuser-Busch Association* case, *supra*, points to the correctness of the conclusion of the trial court in the instant case. While we are inclined to agree with the contentions of the appellant herein that Congress, by the use of the new language in connection with the word ''produced'', intended to authorize drawback on certain articles which had not been ''manufactured'' as that term was sometimes technically defined, we are not disposed to give the provision such a construction as would warrant the allowance of drawback upon every article which had been brought into this country and subsequently exported, merely because some manufacturing effort had been expended thereon.

In section 25 of the tariff act of 1909 may be found the prototype provision of the one under consideration here. It reads, in part:

Sec. 25. That where imported materials on which duties have been paid are used *in the manufacture of* articles manufactured or produced in the United States, there shall be allowed on the exportation of such articles a drawback equal in amount to the duties paid on the materials used, less one per centum of such duties * * *. (Italics ours.)

The word "produced" has been defined on several occasions, its meaning, of course, depending upon the circumstances of its use. Our attention is called to the fact that in *Allen* v. *Smith*, 173 U. S. 389, involving the question of who was the manufacturer or producer of sugar in the United States and as such entitled to a certain bounty. It was held that the manufacturer of the sugar and not the producer of the sugar cane was entitled to the bounty. It was there said:

* * * The word "producer" does not differ essentially in its legal aspects from the word "manufacturer", except that it is more commonly used to denote a person who raises agricultural crops and puts them in a condition for the market. * * *

In *Klepper* v. *Carter*, 286·Fed. 370, the Circuit Court of Appeals for the Ninth Circuit held that—

One who purchased automobile trucks without bodies from one seller and bodies from another, and sold the completed trucks at retail, was a "manufacturer" or "producer" of the trucks.

This ruling related to the tax levied upon the manufacturers or producers of automobile trucks.

It is not difficult to impute a meaning to the word "produced" which when referring to certain exported articles would permit drawback under the section in controversy when the term "manufactured" would not do so, but as applied to the particular articles in controversy here, we can see no warrant for the contentions of appellant that Congress intended that term so to broaden the provisions of the paragraph in the respects with which we are here concerned further than is indicated in the language used and quoted above in the *Anheuser-Busch Association* case. It is our view that if the appellant has not "manufactured" the particular article involved here with the use of imported merchandise, he has not "produced" it with the use of imported merchandise. Women's plain dresses of a given size and make were imported and women's dresses of the same size, but little different in character, were exported. They were still dresses to be worn by the same sized persons, and as far as we know were used for the same purposes in every respect.

As was stated in the *Anheuser-Busch Association* case, *supra*, there was no such "transformation" in the case at bar as meets the requirements of the statute—no new and different article emerged "having a distinctive name, character or use." The dresses were still dresses as the corks in that case were still corks.

In *Hartranft* v. *Wiegmann*, 121 U. S. 609, the question was whether shells which had been cleaned and ground were manufactures of shells or whether they were "not manufactured." The court said:

We are of opinion that the shells in question here were not manufactured, and were not manufactures of shells, within the sense of the statute imposing a duty .

of 35 per centum upon such manufactures, but were shells not manufactured, and fell under that designation in the free list. They were still shells. They had not been manufactured into a new and different article, having a distinctive name, character or use from that of a shell. The application of labor to an article, either by hand or by mechanism, does not make the article necessarily a manufactured article, within the meaning of that term as used in the tariff laws. Washing and scouring wool does not make the resulting wool a manufacture of wool. Cleaning and ginning cotton does not make the resulting cotton a manufacture of cotton. * * * .

We do not intend to hold in this case that by processing and manufacturing efforts imported dresses, such as those imported in this case, may not be so transformed as to bring them within the letter and spirit of the act even though it be done for the sole purpose of obtaining drawback, and it is not our purpose to hold that there might not be such a transformation of such a dress by embroidering it as would meet the requirements of the statute under consideration. It is not improbable that by embroidery, and by many other processes of manufacture, dresses like the ones here imported might be made into new and different kinds of dresses with such new characteristics as to make them new manufactures or productions.

In this case, as has been before stated, no sample showing the condition of the dresses as exported was introduced in evidence, nor were the embroidery designs showing the extent and nature of the embroidery submitted to the court. The testimony is very meager as to just how much embroidery was on the dress and the effect which such embroidery gave to it. The witness was not very definite in describing the character of embroidery nor the extent of the same. The testimony indicates also that such details as he did give of the embroidery on the particular dresses exported was prompted largely by a consideration of what kind of embroidery he had been putting on dresses during his long experience in that line and not by his memory as to the exact degree and style of embroidery on any particular dress involved in this suit.

In one instance, he stated that some of the dresses were embroidered around the front and neck—"The entire front of the dress and also around the necks." How much embroidery was put on the front and around the neck and what effect it had on the appearance and style of the dress was not shown. This could have been shown by introducing a similar dress or by introducing the embroidery designs.

Again, he stated, in referring to the embroidery down the front:

A. Down the front it usually extended about 9 inches wide and 14 to 16 inches in length.

It will be noted that he said "it usually extended". Moreover, the amount of embroidery in this area, its appearance and style is not referred to. A dress might be slightly embroidered down the front a distance of 16 inches, 9 inches wide, and have very little effect on the

appearance or character of the dress. This is especially true if it was not the intent of the embroiderer to enhance the value or the salability of the embroidered article.

With reference to the embroidery around the sleeves, the witness stated that it was the entire sleeve, from shoulder down, except a "certain amount" underneath. This testimony gives no definite idea as to the new appearance or effect of the embroidery. He stated that he was testifying from his personal knowledge "from 25 years in the trade."

It seems to us that even if it be conceded that embroidery of the neck, sleeves and front of a dress might, under some circumstances, bring about such a transformation as to make the new article a manufacture or a production within the intent of the statute, there is no showing, upon this record, that the exported dresses under consideration here had been so processed as to meet the requirements of the statute.

A holding here that the embroidery operation described in the record "manufactured or produced" the exported articles, would, in our judgment, lead to unintended and regrettable results in the future in making application of the important and useful legislation here involved. This would be especially true if we were to sanction the view urged by the importer that where the United States tariff status of the article had been changed, it should be regarded as having been "manufactured or produced." It is quite obvious that ofttimes in tariff acts the dutiable classification of goods is controlled by a condition which involved manufacturing efforts of so little importance that the result would not be the production of such an article as is contemplated by the provision under consideration.

While the fact that by a manufacturing effort expended on an article its tariff status may have been changed is a proper matter to consider along with other circumstances in arriving at a conclusion as to whether the article has been "manufactured or produced", it certainly should not be a controlling consideration. Very slight changes or the manner in which goods are packaged often fix the tariff status of an article. Moreover, there are numerous instances where tariff acts make the manufactured article free of duty and the raw material dutiable. Under the Tariff Act of 1930, typewriters are on the free list while most of the materials used in the manufacture of typewriters are dutiable.

Appellant's counsel very frankly and forcefully presented his views, by brief and by oral argument, with the hope of here securing a positive and definite definition of the terms "manufactured" and "produced" which in the future would be an easily understood and easily applied rule for determining when an article exported had been processed within the meaning of the legislative provision under

·consideration. A careful study of the whole situation makes readily apparent the difficulties which would confront any court if it attempted to lay down a rule more definite in its terms than is found in the above referred to decisions. In order that the purpose of Congress in the ·enactment of the controverted provision may be carried out, we feel that it will be necessary for the customs officials to consider each ·case upon its merits, since it seems to us that the oft-repeated phrase to the effect that certain cases must stand on their own bottoms is applicable here.

The rulings of the Treasury Department, prior to the passage of the Tariff Act of 1922, with reference to the degree of processing and manufacturing necessary to warrant drawback were not always in harmony with each other, and we think constitute no proper basis for the application of the doctrine of legislative adoption of administrative practice.

We are in accord with the holding of the trial court that the collector, under the circumstances of this case, correctly disallowed the ·claim for drawback and the judgment appealed from is *affirmed.*

GRAHAM, Presiding Judge, and GARRETT, Judge, concur in the conclusion.