Albert FARMER, Plaintiff,

v.

PROCESSING UNLIMITED, INC., et
al., Defendants.

No. 76-117-C.

United States District Court,
E. D. Oklahoma.

Nov. 30, 1977.

Jack Durett, II, Durett & Johnson, Tahlequah, Okl., for plaintiff.

Lloyd E. Cole, Jr., Jack E. Rider, Stilwell, Okl., for defendants.

## MEMORANDUM OPINION

MORRIS, Chief Judge.

This case came on for trial before the court sitting without a jury on October 25, 1977, in Muskogee, Oklahoma. Plaintiff in this civil action seeks a declaratory judgment determining that he has a lien in the amount of $26,622.55 on defendant Processing Unlimited, Inc.'s assets which lien has priority over defendant Peoples Bank of Westville's security interests in any assets of Processing Unlimited. As plaintiff recognized during his opening statement, the crucial fact issue to be resolved by the court in this case is whether or not plaintiff qualifies as a producer of agricultural products under 42 Okla.Stat. § 40 (1971). It is agreed that if he does not so qualify he cannot prevail in this action.

Plaintiff resides at his home in Gravette, Arkansas. He is an Arkansas citizen. Defendant Peoples Bank of Westville is an Oklahoma banking corporation having its principal place of business in Westville, Adair County, Oklahoma. Defendant Processing Unlimited, Inc. is an Oklahoma corporation with its principal place of business in Adair County, Oklahoma.[1]

---

1. See Pretrial Order, par. 2. Summary judgment has heretofore been entered in favor of the plaintiff and against the defendant Processing Unlimited, Inc. in the amount of $26,622.55 plus interest, costs and attorneys' fees.

Albert Farmer dealt in cattle until 1977. His principal business was the buying and selling of cattle. Whenever he bought cattle he ordinarily already had a buyer to whom he planned or was committed to sell. He owns eight acres of real estate near Gravette, Arkansas, and from November, 1975 until February 1976 he leased an additional forty acres. On April 29, 1975, plaintiff and James M. Morris entered into a contract with Processing Unlimited to furnish cattle to Processing for slaughter.[2] Plaintiff and James M. Morris were not partners and were not connected with each other in any way other than that they both supplied cattle for slaughter to Processing.

Pursuant to his contract with Processing plaintiff bought cattle fit for butchering. He bought and paid for them in his own name. While there was some intimation by plaintiff that he sold a few cattle to Processing which he had raised himself, testimony as a whole demonstrates, and the court finds, that the cattle which plaintiff delivered to Processing for slaughter were bought by him for that express purpose pursuant to his contract. If he bought more cattle than Processing needed at a given time or if Processing was not ready to slaughter, plaintiff took the cattle not needed by Processing home to Arkansas where he kept them partly on his eight acres and partly on the forty acres he leased until Processing advised him to deliver them. He fed and cared for the cattle at his place until he delivered them for slaughter. On the average, two weeks elapsed between the time he bought the cattle and the time they were slaughtered. However, on at least one occasion plaintiff kept cattle he had bought for five or six weeks. It was not unusual, however, for him to deliver cattle to Processing's plant immediately after he purchased them.

Typically, the cattle delivered to Processing were slaughtered within two or three days after delivery. Processing had facilities to hold cattle prior to slaughtering, and sometimes plaintiff's cattle would be so held when, for instance, the plant was inoperative due to equipment failure. When this occurred, plaintiff fed the cattle kept in Processing's lots and paid for the feed.

On or about August 31, 1975, plaintiff was furnished financial information regarding Processing which then was doing business under the name of Stilwell Packing Company.[3] During that time plaintiff was paid on the basis of carcass weight as soon as Processing loaded the beef onto trucks for shipment to its customers as contemplated under the contract.[4] However, during November 1975 Processing began to fall behind on its payments to plaintiff and he would not be paid until Processing was paid by its customers. Plaintiff nevertheless continued to deliver cattle to Processing until February 1976.[5]

During the period between November 1975 and February 1976 Processing was not able to pay its bills as they became due and was never current on bills payable. From the latter part of February 1976 until the latter part of March 1976, J. C. Morris[6] managed Processing's plant at the request of Mr. Mowery, who was a shareholder of and attorney for Processing. There were no express restrictions imposed upon J. C. Morris' management of the plant by Mowery. Mowery did not tell J. C. Morris that he had to consult him but told him to call him anytime he needed him. J. C. Morris communicated with Peoples Bank once or twice but the bank never gave him any instructions. Any instructions he did receive came from Mowery or another representative of Processing.

Since the freezer had been leased to Catel Foods, J. C. Morris only operated the kill floor. He maintained a trust account in the

2. Plaintiff's Exhibit No. 1.

3. Plaintiff's Exhibits Nos. 3 & 4.

4. *See* Plaintiff's Exhibit No. 1, par. 2.

5. Plaintiff's Exhibit No. 2.

6. He is not the same individual as James M. Morris who contracted with Processing to deliver cattle for slaughter. *See* Plaintiff's Exhibit No. 1. J. C. Morris had owned the packing plant until 1972 when he sold it to Processing Unlimited.

name of Stilwell Packing Company at Peoples Bank of Westville.[7] J. C. Morris was authorized to issue checks on that account.[8] Rental payments received from Catel Foods and earnings derived from the slaughter of cattle and the sale of offal were deposited into the bank account.

After consultation with Mowery, J. C. Morris decided which of Processing's bills should be paid. He paid the utility bills first to ensure that the plant could continue to operate. The bank account was also used to pay for supplies and labor. He knew that the books showed that Processing owed plaintiff approximately $26,000 but he paid him nothing. He had no money to pay anyone except for current operating expenses. He never used any of the money in the account to make payments on Processing's debt obligations to Peoples Bank. During J. C. Morris' management of the plant Processing could not have paid all of its debts as they became due. Nor could it have done so before J. C. Morris took over management of the plant.

When J. C. Morris arrived, there were approximately ten to twelve beef carcasses in the cooler with name tags thereon identifying the owners. Processing only owned three or four carcasses. After selling the carcasses, J. C. Morris paid the respective owners thereof. Upon retaining a different attorney, Processing terminated the services of J. C. Morris in late March of 1976. When J. C. Morris left the trust account was overdrawn by $12.00. He operated the kill floor for five weeks.

Plaintiff requests the court to determine that he has a lien in the amount of $26,-

7. Defendant's Exhibit No. 2.

8. Defendant's Exhibit No. 1.

9. A receiver was appointed on November 10, 1976 in the District Court of Adair County, State of Oklahoma, Case No. C–76–15, to take possession of Processing's property. Plaintiff's Exhibit No. 5.

10. Plaintiff's contention that he sold dressed beef carcasses rather than live animals is based on the following contractual provisions:
   1. Seller agrees to sell and deliver to the Buyer cattle to be purchased by the Buyer hanging upon the rail in the plant of the

622.55 on Processing's assets, which lien is entitled to priority over any security interests defendant Peoples Bank may have in Processing's assets. In this regard plaintiff contends that he is a producer of agricultural products within the meaning of 42 Okla. Stat. § 40 (1971), and that he therefore acquired a preferred lien under that section on account of the beef carcasses which he sold to Processing within the statutory four months' period prior to an adjudication of insolvency. Plaintiff does not seek a money judgment against defendant bank and he has abandoned his previous request for the appointment of a receiver.[9]

Defendant Peoples Bank contends that plaintiff is not a producer of agricultural products so as to come within the provisions of section 40, because he did not raise cattle but merely purchased and delivered them to Processing for slaughter and sale of the carcasses pursuant to the contract between plaintiff and Processing. Defendant therefore contends that plaintiff was a merchant rather than a producer.

Plaintiff responds that pursuant to the contract he had with Processing he sold dressed beef carcasses to Processing and not live animals,[10] and therefore qualifies as a producer of agricultural products.

As the court noted previously, plaintiff concedes that he cannot prevail in this action unless he qualifies as a producer of agricultural products within the meaning of 42 Okla.Stat. § 40 (1971). That section provides:

   § 40. Corporations—Insolvent estates— Employees liens and liens for agricultural and dairy products.

   Buyer; said purchase price shall be determined by the pound with the price being determined between said parties from week to week, *depending upon the existing livestock market,* said price to be determined prior to the time said cattle are slaughtered. 2. Parties further agree that the ownership of the processed meat product shall remain in the Sellers until such time as said processed meat product is removed from the facilities of the Buyer, at which time the Buyer shall pay to the Seller the price as previously determined.
   Plaintiff's Exhibit No. 1.

When any corporation, formed under the provisions of the laws of the State of Oklahoma, or any corporation doing business within this State shall become insolvent, the employees performing labor or services of whatever character in the regular employ of such corporation, and the producers of agricultural and dairy products, including cooperative marketing associations of such producers, shall have a lien upon the assets of such corporation for the amount of salary or wages or payments for agricultural and dairy products due them, not exceeding four (4) months' salary or wages or payments for such products which shall have accrued prior to the adjudication of the insolvency of such corporation, which lien shall be paid prior to any other debts, charges or claims against said corporation, except taxes due the United States Government or the State of Oklahoma. The word "employees" shall not be construed to include any of the officers of such corporation.

As the court observed in its order of October 17, 1977, denying defendant Peoples Bank's motion for summary judgment, the term "producers of agricultural products" is not defined in the statute. The court's research has not disclosed and the parties have not made the court aware of any case interpreting this statutory phrase. In interpreting the phrase "agricultural purposes" contained in 69 Okla.Stat. § 281, repealed by Laws 1968, ch. 415, § 1906, the Supreme Court of Oklahoma stated in *Chapman v. Koenig*, 205 Okl. 402, 238 P.2d 357 (1951):

A generally adopted definition of "agriculture" is found in 2 Am.Jur. 395, wherein it is said:

"Agriculture, in the broad and commonly accepted sense, may be defined as the science or art of cultivating the soil and its fruits, especially in large areas or fields, and the rearing, feeding, and management of livestock thereon, including every process and step necessary and incident to the completion of products therefrom for consumption or market and the incidental turning of them to account. The term is broader in meaning than 'farming;' . . . "

205 Okl. at 404, 238 P.2d at 358–359. *See* 3 Am.Jur.2d *Agriculture* § 1 (1962). Webster defines "agriculture" as

the science or art of cultivating the soil, harvesting crops, and raising livestock: TILLAGE, HUSBANDRY, FARMING . . . the science or art of the production of plants and animals useful to man and in varying degrees the preparation of these products for man's use and their disposal (as by marketing).

Webster's Third New International Dictionary of the English Language 44 (1965 unabr. ed.). "Producer" is defined as "one that produces, brings forth, or generates," and as "one that *grows* agricultural products or *manufactures* crude materials into articles of use." *Id.* at 1810 (emphasis added). And it has been said that

[t]he term producer is "commonly used to denote a person who raises agricultural crops, and puts them in a condition for the market." *Allen v. Smith*, 173 U.S. 389, 399, 19 S.Ct. 446, 449, 43 L.Ed. 741; *Pampanga Sugar Mills v. Trinidad*, 279 U.S. 211, 217, 49 S.Ct. 308, 73 L.Ed. 665.

*Tennessee Burley Tobacco Growers' Association v. Commodity Credit Corp.*, 350 F.2d 34, 41 (6th Cir. 1965), *cert. denied*, 383 U.S. 907, 86 S.Ct. 886, 15 L.Ed.2d 662 (1966).

The evidence adduced in this case clearly demonstrates that Albert Farmer was a cattle buyer for Processing Unlimited and not a producer of agricultural products. The cattle which he delivered to Processing between November 1975 and February 1976 were purchased by him for the express purpose of selling them to Processing. He did not buy the cattle to raise them and he did not raise them. Rather, he purchased the cattle to fulfill the provisions of his contract with Processing. By no stretch of the imagination can it therefore be said that plaintiff was a producer with respect to those cattle which he delivered to Processing.

Nor does the fact that plaintiff sold dressed beef carcasses instead of live animals pursuant to the terms of his contract

make him an agricultural producer. It certainly cannot seriously be contended that plaintiff, who otherwise was not a producer of agricultural products, became one by virtue of the fact that pursuant to the parties' contract,[11] he retained an ownership interest in the cattle delivered to Processing and the processed meat product derived therefrom. There is no evidence that plaintiff had anything to do whatsoever with the slaughter and processing of the meat.[12] He did not in any sense of the word "produce" the dressed beef carcasses.

Since plaintiff was a cattle buyer for Processing and not a producer of agricultural products within the meaning of 42 Okla.Stat. § 40 (1971), he cannot avail himself of the preferred lien under that section and therefore cannot prevail in this action. Judgment will be entered in conformity herewith.

11. Plaintiff's Exhibit No. 1, par. 2.

12. The fact that plaintiff on occasion may have fed his cattle which were kept in Processing's lots when the plant was inoperative is not inconsistent with the conclusion that he played no part in the processing of the cattle. By feeding the cattle, plaintiff simply protected his ownership interest in the cattle which he had retained pursuant to paragraph 2 of the contract.