TENNESSEE BURLEY TOBACCO GROWERS' ASSOCIATION, Appellee and Cross-Appellant,

v.

COMMODITY CREDIT CORPORATION, Appellant and Cross-Appellee.

Nos. 15899, 15900.

United States Court of Appeals Sixth Circuit.

Sept. 2, 1965.

**36**

R. Arnold Kramer and Arthur G. Seymour, Knoxville, Tenn., Frantz, McConnell & Seymour, Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., of counsel, for Tennessee Burley Tobacco Growers Ass'n.

John C. Eldridge, Dept. of Justice, Washington, Ohio, John W. Douglas, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., John H. Reddy, U. S. Atty., Knoxville, Tenn., on brief, for Commodity Credit Corporation.

Before MILLER and PHILLIPS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

PHILLIPS, Circuit Judge.

In this action for breach of contract the Tennessee Burley Tobacco Growers' Association, plaintiff, seeks to recover from Commodity Credit Corporation, defendant, for overhead expenses incurred by the Association in connection with the tobacco price support loan program.

The district judge, sitting without a jury, entered judgment in favor of the Association for $173,121.16, and Commodity has appealed. The Association has filed a cross-appeal, contending that it is entitled to recover an additional $48,704.32 and that its judgment should be increased to $221,825.48.

Jurisdiction is invoked under 15 U.S.C. § 714b(c), and is not disputed.

We reverse the judgment against Commodity and affirm as to the cross-appeal.

The plaintiff, referred to herein as the Association, is a farmers' cooperative marketing association, incorporated in 1946 under the cooperative marketing laws of the State of Tennessee. T.C.A. §§ 43–1801—43–1849. Its membership consists of more than 70,000 Tennessee tobacco growers. It was utilized by defendant in the conduct of the tobacco price support loan program in Tennessee during the crop years 1945 through 1955 except for 1953. This litigation involves the 1951, 1952, 1954 and 1955 crop years.

The defendant, referred to herein as Commodity, is a corporate agency and instrumentality of the United States, created by the Commodity Credit Corporation Charter Act, 15 U.S.C. § 714 et seq., through which the Secretary of Agriculture conducts price support loan programs for tobacco and certain other agricultural commodities. The programs for the years here involved were administered under the Agricultural Act of 1949, as amended, 7 U.S.C. § 1421 et seq.

## Factual Background

Commodity was created for the purpose, among others, of "stabilizing, supporting, and protecting farm income and prices." 15 U.S.C. § 714. One of its objectives is to assure a minimum price to farmers by placing a floor under the price of certain agricultural commodities. 1948 U.S. Congressional Service, p. 2145.

The status of Commodity was described by the Supreme Court in Rainwater v. United States, 356 U.S. 590, 591–592, 78 S.Ct. 946, 948, 2 L.Ed.2d 996, as follows:

"Commodity is an 'agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture.' It was created by Congress to support farm prices and to assist in maintaining and distributing adequate supplies of agricultural commodities. Its capital was provided by congressional appropriation. Any impairment of this capital, which at times has been great due to the nature of its activities, is replaced out of the public treasury; any gains are returned to that treasury. All of its officers and other personnel are employees of the Department of Agriculture and are compensated as such. Like other government corporations, Commodity is subject to the provisions of the Government Corporation Control Act which provides such close budgetary, auditing and fiscal controls that little more than a corporate name remains to distinguish it from the ordinary government agency. In brief, Commodity is simply an administrative device established by Congress for the purpose of carrying out federal farm programs with public funds."

Relevant statutory powers of Commodity are set forth in the margin.[1]

1. 15 U.S.C. § 714b:

"(c) May sue and be sued, but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Corporation or its property. * * *

*    *    *    *    *

"(e) Shall have all the rights, privileges, and immunities of the United States with respect to the right to priority of payment with respect to debts due from insolvent, deceased, or bankrupt debtors. The Corporation may assert such rights, privileges, and immunities in any suit, action, or proceeding.

*    *    *    *    *

"(g) May enter into and carry out such contracts or agreements as are necessary in the conduct of its business. State and local regulatory laws or rules shall not be applicable with respect to contracts or agreements of the Corporation or the parties thereto to the extent that such contracts or agreements provide that such laws or rules shall not be applicable, or to the extent that such laws or rules are inconsistent with such contracts or agreements.

*    *    *    *    *

"(j) Shall determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid.

*    *    *    *    *

"(l) May make such loans and advances of its funds as are necessary in the conduct of its business."

Section 714c, 15 U.S.C., defines the specific powers of the Corporation. One of these specific powers is to support the prices of agricultural commodities through loans, purchases, payments and other operations. In the performance of these functions the section directs that:

"* * * the Corporation shall, to the maximum extent practicable consistent with the fulfillment of the Corporation's purposes and the effective and efficient conduct of its business, utilize the usual and customary channels, facilities, and arrangements of trade and commerce."

Further provision is made for the carrying out of the purposes of Commodity in 15 U.S.C. § 714j:

"The Corporation may, in the conduct of its business, utilize on a contract or fee basis, committees or associations of producers, producer-owned and producer-controlled cooperative associations, and trade facilities."

The legislative history of the latter section includes the following:

"In carrying out its price-support program the Corporation utilizes normal trade facilities to the fullest prac-

Pursuant to these powers Commodity entered into loan agreements with the Association for the purpose of supporting tobacco prices for the crop years 1946 through 1955, except for 1953.[2] During the relevant crop years, the price support level for burley tobacco was ninety per cent of a predetermined fixed price, called "parity." Basically the loan agreements provided that Commodity would make low interest non-recourse loans to the Association for the purchase of tobacco and for the payment of direct and overhead expenses of the Association in its handling, storage and reselling, when approved by Commodity as reasonable and necessary.

The program established under the loan contracts operated in this way: The growers brought their tobacco to an auction warehouse, where it was graded according to quality and condition before being offered for sale. Commercial tobacco buyers were afforded an opportunity to bid on all such tobacco. If the bid price on the grower's tobacco was not more than one bid above the support price for that particular grade, the Association bought the tobacco at the support price. The auction warehouseman paid the grower the support price and was subsequently reimbursed by the Association out of money loaned to the Association by Commodity for that purpose. The Association would then re-dry and store the tobacco in warehouses until it was later resold.

It was the hope of both the Association and Commodity that the tobacco purchased by the Association from growers with government funds would be sold later at higher prices, either because of an increase in the market price or because the tobacco would improve with age. For the years prior to 1951 the crops ultimately were sold for a profit which was more than sufficient to cover the purchase price and all expenses. The money borrowed by the Association from Commodity was repaid in full. Part of the balance was distributed by the Association among the growers and the re-

ticable extent. Thus, where loans are made to farmers the Corporation makes use of local banks, cooperatives, and other private lending agencies by entering into contracts with such lending agencies under which the Corporation agrees to take over loans made in accordance with the Corporation's program. In addition, the Corporation enters into contracts with processors and dealers under which they buy through normal trade channels agricultural commodities at support prices for the account of the Corporation or for their own account. In the latter event the Corporation generally agrees with the processors and dealers, upon specified terms and conditions, to take over their inventories of such agricultural commodities or products processed therefrom, or otherwise gives them protection against loss arising out of the purchase of commodities at the support prices." 1948 U.S.Code, Congressional Service, p. 2146.

"Section 12 permits the Corporation to utilize, on a contract or fee basis, committees or associations of producers, producer-owned and producer-controlled cooperative associations, and trade facilities. Most of the Corporation's price-support operations are carried out in the field through the agricultural conservation committees and associations. The Corporation also utilizes to the fullest practicable extent the facilities of producer-controlled cooperative associations and trade facilities, such as local banks, warehouses, commodity handlers, and processors. For example, commodity loans are generally made in the first instance by local banks with which the Corporation has contracts obligating it to take over the loans upon request. It has also carried out many of its price-support operations by contracts with processors and handlers under which they agree to purchase commodities at support prices in return for the Corporation's undertaking to protect them against loss because of such purchases." 1948 U.S.Code, Congressional Service, pp. 2153–4.

2. A crop year extends from December 1 through November 30. Thus, the 1951 crop year was from December 1, 1951, through November 30, 1952.

mainder was held by the Association in reserve.[3]

For the crop years 1951, 1952, 1954 and 1955, there was a deficiency of $1,207,273.29 between the amount of the loans, including interest, and the amounts ultimately realized from the sale of the tobacco. This deficiency was absorbed by Commodity.

Because of disagreements between Commodity and the Association, no loan contracts were entered into for 1953 or after the 1955 crop year. The Association continued to hold the remaining portions of the 1951, 1952, 1954 and 1955 tobacco crops which were collateral for the loans for those years. Upon demand of Commodity, the Association from and after May 20, 1957, remitted to Commodity the gross proceeds from the sale of said tobacco from time to time as sold. On May 21, 1958, Commodity called the loans on the crops for these four years, and, upon non-payment, pooled all such tobacco. In August 1958 Commodity replevied the remainder of the tobacco, and sold it in 1960 for $11,153,944.38. The total of the outstanding loans owed by the Association to Commodity, including interest, was $12,361,217.97. As heretofore stated, this deficiency of $1,207,273.59 was borne by Commodity and is not in dispute in this litigation.

On June 30, 1957, the Association was adjudged a bankrupt. The complaint in this cause was filed by the trustee in bankruptcy. Later a determination was made that the trustee had in his possession assets over and above that necessary to bear all costs of administration. The trustee thereupon assigned to the Association all such properties and assets, including this right of action, and the Association was substituted as party plaintiff. The record indicates that the Association has a present net worth of $300,000 or more.

### The Present Controversy

The present controversy involves overhead expenses incurred by the Association for the 1951, 1952, 1954 and 1955 crop years. The Association contends that Commodity is obligated to reimburse it for these expenses.

It is contended by Commodity that under the terms of the loan agreements the overhead expenses of the Association were to be financed in two ways: First, the members of the Association paid to it twelve cents per hundredweight for all the tobacco sold, and the tobacco warehousemen paid three cents per hundredweight, which the warehousemen in turn collected from the growers. Second, if overhead expenses in excess of these charges were approved by Commodity, non-recourse loans were made to the Association for the approved amounts. In addition, if the Association desired to expend greater sums for expenses, it could do so from its own funds,[4] but at its own risk and without any right of reimbursement.

All of the overhead expenses included in the judgment of the district court were paid by the Association out of its own funds. No part of the overhead expenses here involved were borrowed from Commodity.

The question to be determined in this case is whether or not Commodity is liable to the Association for the reimbursement of these expenses.

3. The refusal of the Association to distribute all of the net profits to growers in cash resulted in protracted litigation in Tennessee courts. See Range v. Tennessee Burley Tobacco Growers Association, 41 Tenn.App. 667, 298 S.W.2d 545 (1955); Neas v. Tennessee Burley Tobacco Growers' Association, 204 Tenn. 405, 321 S.W.2d 802 (1959).

4. The Association had funds of its own derived from such sources as $3.00 lifetime membership dues collected from its members, loose floor income, consignment fees, interest income, gains on the sale of fixed assets, patronage refunds from other cooperatives, profits from storage warehouse operations and miscellaneous income. It also held reserves from undistributed net gains from the ultimate sale of tobacco crops for prior years in excess of the amounts of loans, all of which had not been distributed to growers. See cases cited in third footnote.

*Judgment of The District Court*

One of the issues presented in the district court was the meaning and interpretation of the contracts between the parties. The Association contended that under the terms of the contracts for the crop years in question Commodity agreed to reimburse it for unrecouped overhead expenses incurred in excess of those approved and advanced by Commodity. Commodity contended to the contrary, maintaining that under the provisions of the contracts it was responsible only for those overhead expenses which it approved and for which it made loans.

The district court did not resolve this disputed issue of contract interpretation, saying:

"In so far as the Court can ascertain, however, there was no specific agreement between the parties as to which would bear any loss arising from the administration of the support program if the collateral was not resold for a sufficient amount to bear all such expenses."

Although not holding as a matter of contract interpretation that Commodity had agreed to reimburse the Association for unapproved and unrecouped overhead expenses in excess of the amounts advanced, the court held that Commodity is liable for these expenses on two grounds:

First, that liability for these expenses is imposed upon Commodity by 7 U.S.C. § 1425, regardless of the provisions of the contracts between the parties. On this point the district court said:

"The Congress has declared by statute that no producer shall be personally liable for any deficiency arising from the sale of the collateral securing any loan made under the authority of the Agricultural Adjustment Act of 1949 except where the producer obtains the loan by means of fraudulent representations. 7 U.S.C. § 1425. The obvious intention of the Congress in this enactment was to relieve fraud-free growers of any pecuniary responsibility from the administration by the Secretary of Agriculture of the price support program. * * *

"The plaintiff is a cooperative marketing association of burley tobacco producers. The legislative history of the Agricultural Adjustment Act of 1949, and earlier statutes of similar import, indicate to this Court that the Congress intended that the pecuniary responsibility for the administration of the price support program would be borne by the Government, not by the producers. * * * [T]he contract between these parties derived its efficacy from the Agricultural Adjustment Act of 1949, and earlier statutes of similar nature, and it is circumscribed by all the pertinent provisions of that statute. * * * Commodity could not, by contractual provisions or otherwise, deprive these producers of the absolution the Congress granted them by statute."

Second, that the Association was the agent of Commodity, and " * * * the law implies a promise of reimbursement for necessary expenses advanced or incurred by the Association in order to consummate what the Association agreed to do, where the acts were in the scope of its agency."

*Is the Association a Producer?*

The first question to be determined on this appeal is whether the Association is a "producer" within the meaning of 7 U.S.C. § 1425.[5] The holding of the district court that this statute imposes upon Commodity the legal obligation to reimburse the Association for overhead expenses incurred by it cannot stand unless the Association comes within the statutory term "producer."

5. This section is entitled "Personal liability of producers for deficiencies" and provides as follows:
    "No producer shall be personally liable for any deficiency arising from the sale of the collateral securing any loan made under authority of this Act unless such loan was obtained through fraudulent representations by the producer. * * *"

The definition section of the Agricultural Act of 1949, 7 U.S.C. § 1428, does not specifically define producer, but does define a producer who complies with acreage allotments:

"(b) A 'cooperator' with respect to any basic agricultural commodity shall be a *producer on whose farm* the acreage planted to the commodity does not exceed the farm acreage allotment for the commodity under subchapter II of chapter 35 of this title, or in the case of price support for corn or wheat to a producer outside the commercial corn-producing or wheat-producing area, a producer who complies with conditions of eligibility prescribed by the Secretary. For the purpose of this subsection, a producer shall not be deemed to have exceeded his farm acreage allotment unless such producer knowingly exceeded such allotment." (Emphasis supplied.)

In United States v. Appling, 239 F. Supp. 185, 191 (S.D.Texas), the court said:

"Under the Agricultural Act of 1949 (7 U.S.C.A. § 1421 et seq.) a producer is entitled to aid by price support if he is a 'cooperator'. A cooperator is a *producer on whose farm* the acreage planted to the commodity does not exceed the farm acreage allotment. 7 U.S.C.A. § 1428(b)." (Emphasis supplied.)

The use in this statutory definition of the phrase "a producer on whose farm" strongly indicates that by the term "producer" Congress meant individuals or organizations having farms and raising commodities thereon.

The basic definition of a "producer" is "one who *grows* agricultural products * * *." (Emphasis supplied.) Webster's Third New International Dictionary, Unabridged.

The term producer is "commonly used to denote a person who raises agricultural crops, and puts them in a condition for the market." Allen v. Smith, 173 U. S. 389, 399, 19 S.Ct. 446, 449, 43 L.Ed.

741; Pampanga Sugar Mills v. Trinidad, 279 U.S. 211, 217, 49 S.Ct. 308, 73 L.Ed. 665.

In Puckett v. Sellars, 235 N.C. 264, 69 S.E.2d 497, 499, which involved marketing provisions of the price support program, the court said:

"*It is the producer who is granted the production quota.* It is he who overproduces, and the penalty is intended to penalize him for his overproduction. He markets his tobacco * * *." (Emphasis supplied.)

In ascertaining the meaning of the word "producer" we also look to the regulations of the Department of Agriculture. Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; Weir v. United States, 310 F.2d 149, 154 (C.A. 8). In the regulations relating to price support for tobacco for the 1955–56 marketing years, an "eligible producer" for the purpose of the tobacco price support program was defined as one for whom a marketing card had been issued under the regulations dealing with tobacco marketing quotas for the 1955–56 marketing years. 20 Federal Register 3525. The tobacco marketing quota regulations for the 1955–56 years in turn define a "producer" as "a person who as *owner, landlord, tenant, sharecropper, or laborer,* is entitled to share in the tobacco available for marketing from the farm * * *." (Emphasis supplied.) 20 Federal Register 4107. Similar provisions are contained in the regulations relating to tobacco price support and tobacco marketing quotas for the other years involved in this case.

The Association as an entity does not own or operate farms and does not produce tobacco. It only receives tobacco from the growers that do produce it. We hold that the term "producer" is used in the statute in its ordinary sense, and is intended to apply to persons or organizations that grow tobacco, such as the owner of a farm, a tenant on a farm, a sharecropper or similar person. The term does not encompass an incorporated organization such as the Association here involved which does not grow crops, but

merely receives them from producers for handling.

■■ Commodity's utilization of such an Association in the tobacco price support program does not make the Association a "producer" within the meaning of the statute. "Congress in adopting Section 1425 simply intended to absolve producers from personal liability for loan deficiencies resulting from sales of pledged commodities at price levels lower than the support prices in force at the time the loan was made * * *." Autrey v. Commodity Credit Corporation, 143 F.Supp. 550, 554 (W.D.Ark.). There was full compliance with the statute when the growers received ninety per cent of the parity price for their tobacco and Commodity absorbed the entire loan deficiency arising from the sale of the tobacco.

■ The district court apparently adopted the reasoning that since the Association is a cooperative whose members are producers, the Association itself should be treated as a producer. A similar argument was rejected by the Supreme Court in United States v. Rock Royal Co-op, 307 U.S. 533, 578–581, 59 S.Ct. 993, 83 L.Ed. 1446. In that case an Association which handled milk produced by its members argued that for purposes of a milk marketing order issued by the Secretary of Agriculture under Section 8c of the Marketing Agreement Act, 7 U.S.C. § 608c, the Association was the alter ego of its producer members and should be treated as a producer rather than a handler. The Supreme Court pointed out that the "cooperative owns no farms" and that it merely receives milk from its members and distributes it (307 U.S. at 578, 59 S.Ct. 993), and held that the cooperative was a handler and not a producer. To like effect see Elm Spring Farm v. United States, 127 F.2d 920 (C.A. 1); Lucas County Farm Bureau Cooperative Association v. N.L.R.B., 289 F.2d 844, 845 (C.A. 6), cert. denied, 368 U.S. 823, 82 S.Ct. 42, 7 L.Ed.2d 28.

By the terms of the Cooperative Marketing Association Act of Tennessee, T.C.A. §§ 43–1801—43–1849, under which the Association was chartered, it is an entity separate and apart from its members. T.C.A. § 43–1803 defines an association as "any corporation organized under this law," and refers to members of such an association as "producers." The state statute provides for articles of incorporation, by-laws, a board of directors, an executive committee, a president, vice-presidents, a secretary and a treasurer. Under the terms of T.C.A. § 43–1845, the provisions of the general corporation laws of Tennessee and all powers and rights thereunder are made applicable to such associations except where in conflict or inconsistent with the Cooperative Marketing Association Act. T.C.A. § 43–1825 expressly provides that:

"No member shall be liable for the debts of the association to an amount exceeding the sum remaining unpaid on his membership fee or his subscription to the capital stock, including any unpaid balance on any promissory notes given in payment thereof."

Under the provisions of this latter statute as well as under 7 U.S.C. § 1425, the producer-members of the Association are not liable for deficiencies in loans made by Commodity to the Association.

It thus appears that each grower (i. e. producer) in this case has been paid the full ninety per cent of parity price for his tobacco. Commodity has not sought and does not seek to hold any grower personally liable for any part of the loan deficiency. The Association already has paid the overhead expenses which it now seeks to recover. If it fails to recover these expenses from the Government, this will not result in any grower having to give up any of the ninety per cent of parity price which he already has received for this tobacco. The reversal of the judgment of the district court will not result in any grower becoming personally liable for any part of the deficiency arising from the sale of the collateral tobacco.

We hold that the Association is not a producer within the meaning of the stat-

ute and that the district court erred in ruling that this statute renders Commodity liable for overhead expenses incurred by the Association regardless of the provisions of the contracts between the parties.

*Is Commodity Liable Under an Implied Promise to Reimburse Expenses?*

The second question to be determined is whether the district court was correct in the following holding:

"The Association was engaged by the defendant Commodity to perform detailed functions in behalf of the latter; and, under such circumstances, the law implies a promise of reimbursement for necessary expenses advanced or incurred by the Association in order to consummate what the Association agreed to do, where the acts were in the scope of its agency."

We reemphasize that this second ground for the judgment of the trial court is based upon the theory of *implied* promise to pay, and not upon a holding that Commodity has obligated itself by contract to reimburse unrecouped overhead expenses paid by the Association out of its own funds.

This issue, in turn, poses other serious questions, including these:

1. Was the relationship between the parties that of principal and agent, as held by the district court, or simply that of creditor-debtor as insisted by Commodity?

2. Did Commodity have the power to confer upon the Association the status of agent of the United States with authority to incur expenses reimbursable as Government obligations as a matter of right?

3. Assuming that the answer to the second question is in the affirmative and that the relationship between the parties was that of principal and agent, does the rule of the law of agency, that there exists a promise implied in law that the principal will reimburse the agent for necessary expenses even though the principal did not expressly authorize or con-

tract to reimburse such expenses, apply as against the United States?

These three intriguing questions have been briefed and argued thoroughly, but we do not find it necessary to pass upon them in this case. We conclude that the issue of the liability or nonliability of Commodity for the overhead expenses of the Association is controlled by the agreements between the parties. The rule that a promise is implied on the part of the principal to reimburse his agent for necessary expenses does not apply under the facts in this case, where the limits of Commodity's liability for such expenses are prescribed by contract. Therefore, assuming, but not deciding, that (1) the Association was the agent of Commodity, (2) that Commodity had the authority to create such an agency relationship, and (3) that the rule of a promise of reimbursement implied in law might apply against an agency of the United States, nevertheless this rule of indemnity is applicable only "in the absence of terms to the contrary in the agreement." Restatement, Agency 2d, § 438.

The rights and obligations of Commodity and parties contracting with it "depend on the terms and conditions of the particular contract, construed and enforced in accordance with general principles of law and in the light of applicable statutes." 91 C.J.S. United States § 70, p. 140; cf. Commodity Credit Corporation v. Worthington, 263 F.2d 178 (C.A. 4), cert. denied, 359 U.S. 1012, 79 S.Ct. 1148, 3 L.Ed.2d 1036; Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504, 508 (C.A. 9), cert. denied, 355 U. S. 837, 78 S.Ct. 62, 2 L.Ed.2d 48; Restatement, Agency 2d, § 376.

*The Contracts Between The Parties*

Accordingly we now turn to the provisions of the agreements between the parties, which we deem to be controlling. Separate loan contracts were executed by Commodity and the Association for each of the crop years in question, the terms of which were substantially identical. Pertinent extracts from the 1955 con-

tract, which were also incorporated in the loan contracts for the other years in question, are quoted in the margin.[6]

In accordance with the provisions of the loan contracts, the Association submitted budgets of proposed overhead expenses to Commodity for approval for each of the four crop years in question. In some instances Commodity refused to approve these proposed budgets on the ground that they were excessive and required that they be reduced before funds for overhead expenses were advanced.[7]

6. "1. Commodity agrees to make a loan to the Association upon the security of loan tobacco as defined in paragraph 2 hereof and upon the security of reusable hogsheads purchased by the Association. Such loan shall consist of the amounts set out in subparagraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), and (j) of this paragraph, but shall not exceed a total of $5,000,000.00. Commodity shall have the right to reduce or increase the maximum commitment set out in this paragraph at any time upon notice to the Association: Provided, That any reduction shall not apply with respect to tobacco marked for or delivered to the Association prior to the time of such notice. Such loan shall bear interest at the rate of three and one-half (3½) percent per annum.

"(a) An amount for each pound of loan tobacco, computed in accordance with Exhibit A, on the basis of green weight (farm sales weight): Provided, That such amount shall not exceed the amount advanced by the Association to the grower with respect to such tobacco except for the deduction of 12 cents per cwt. which the Association makes to apply against the overhead expenses of the Association, and such other deduction as may be authorized or approved by Commodity.

"(b) An amount to cover overhead expenses of the Association in connection with loan tobacco, subject to the following conditions:

"(1) Request for payment shall be made only as funds are currently needed by the Association to pay for such overhead expenses; *shall be made only for overhead expenses approved by Commodity as reasonable and necessary;* and shall be made only to the extent that the overhead expenses exceed 12 cents per hundred pounds, green weight, of loan tobacco. (Emphasis supplied.)

"(2) Any funds collected by the Association from tobacco growers either directly or through warehousemen in addition to the 12 cents per cwt. referred to in subparagraph 1(a) (other than permanent membership fees or stock sales to obtain capital funds) shall be utilized, first, to finance activities and expenditures of the Association relating to Burley Tobacco other than overhead costs of handling loan tobacco; second to establish reasonable reserve as approved by Commodity; and third, to pay overhead costs of handling loan tobacco which would otherwise be advanced by Commodity.

*     *     *     *     *

"12(e) If the Association expects to request funds from Commodity during the period of this Agreement for use in payment of overhead costs, the Association shall submit to Commodity budgets of expenditures, the first of such budgets to be submitted prior to the incurring of any obligations by the Association. The form of such budgets shall be acceptable to Commodity and shall contain such details as may be requested by Commodity both as to use such funds and use of any other funds available to the Association for payment of overhead costs."

7. For example, the Acting Director of the Commodity Stabilization Service, Tobacco Service, wrote the following letter to the Association disapproving the proposed budget for 1955:

"This is in reply to your letter of December 30, 1955, to Mr. Miller, enclosing a revised budget of overhead expenses in the amount of $59,589.00 for the current operating year.

"It is regretted that we are unable to approve the revised budget. In view of the quantity of tobacco pledged for CCC loans prior to the holidays, it appears that the total quantity of 1955 crop tobacco pledged by your organization may not reach 5,000,000 pounds. Total overhead costs of almost $60,000, therefore, probably will reflect a cost of $1.20 per cwt. or more. We have recently reviewed the overhead costs of all of the Associations which handle the tobacco price support program in the Burley and flue-cured areas and find that the average overhead cost up to the present time of handling the 1946 through 1954 crops was 30.3 cents per cwt. The expenses of your organization for the same period are by far the highest in the group and have exceeded 75 cents per cwt., the figures being incomplete because we have not as yet received requested reports of

During each of the four years the Association expended more for overhead than it borrowed. It contends, and we think correctly so, that budgets had to be submitted only if the Association expected to borrow overhead funds from Commodity. The Association further asserts that it used its own funds for overhead expenses for sound business purposes, such as to avoid the payment of interest, and that these overhead expenses were incurred with the knowledge of Commodity and with the understanding that they would be reimbursed.

■ We find that it was contemplated that Commodity would make loan contracts in administering the tobacco price support program and that Commodity was to make payments in the form of loans. See Senate Report on the Commodity Corporation Charter Act of June 29, 1948, 1948 U.S.Code Congressional Service, pp. 2138, 2145. We construe the contracts in the present case as conforming to this policy.

■ Commodity had no power to prevent the Association from expending its own funds.[8] It sought broader powers and controls over the operations and expenditures of the Association during unsuccessful negotiations for a loan agreement for the crop year 1953 by insisting upon including in the contract the provision quoted in the margin.[9] When the Association declined to agree to this provision, no contract was executed between the parties for 1953, and a contract was awarded to another Tennessee cooperative for that crop year. The Secretary of Agriculture subsequently instructed Commodity not to insist on this language, and it was not included in the 1954 and 1955 contracts.

■ Since Commodity had no control over overhead expenditures made by the Association from its own funds, assuredly it cannot be held liable to reimburse such expenditures in the absence of a clear contractural provision to that effect. We find no such provisions in the contracts for the crop years in question. To the contrary we do not construe the contracts to make Commodity liable for any of the Associations' overhead ex-

---

your expenses for the past year. All of the other organizations, large and small, are able to carry out on a satisfactory basis their obligations under the price support program, more economically than the Tennessee Burley Tobacco Growers Association.

"As we have previously indicated, *we seriously question whether the total expenses of the Association relate entirely to and are necessary for the satisfactory operation of the price support program.* One possible method of determining what portion of the expenses are applicable to price support activities would be to 'departmentalize' your organization and its operations. This would require allocation of each expense item as between price support operations and other activities and probably would not be especially practicable. Another possible solution would be for the Association to finance its overhead costs with its own funds, without borrowing from CCC. (Emphasis supplied.)

"The only other alternative we see at the present time is to establish a limitation as to the amount which CCC will advance to the Association for overhead costs. Under the circumstances, we are unwilling to advance CCC funds for overhead in excess of 75 cents per cwt. for 1955 crop operations during the current year, including the 12 cents per cwt. deducted from the loan rates."

8. After Commodity had refused to approve its 1952 budget, the Association reduced its proposed overhead expenses for that year and submitted a lower budget, saying:

"To the degree that the Association's actual overhead of the period December 1, 1951 to November 30, 1952 exceeds the overhead funds provided for above, the Association will use funds otherwise available to it to meet the additional amount of overhead. * * * "

9. Commodity insisted that the following provisions be included in the contract for 1953 and future years:

"The Association shall submit for approval by Commodity periodic budgets of estimated income and expenditures as requested. The Association shall conduct its operations in accordance with such approved budgets and shall submit operating and other financial statements as requested by Commodity."

penses except those approved in advance and included in loan payments.

We reject a construction of the contracts which would deprive the Government of control over the amounts to be advanced or reimbursed to cover overhead expenses in connection with the price support loan program. We find no provision that reasonably could be construed as conferring upon the Association carte blanche authority to obligate the Government for any and all overhead expenses it might see fit to incur. Such fiscal irresponsibility on the part of Commodity is not lightly to be inferred.

As said by the Supreme Court in Federal Crop Ins. Corp. v. Merrill, supra, 332 U.S. 381, 385, 68 S.Ct. 3:

> "The oft-quoted observation in Rock Island, Arkansas & Louisiana R. Co. v. United States, 254 U.S. 141, 143 [41 S.Ct. 55, 65 L.Ed. 188], that 'Men must turn square corners when they deal with the Government,' does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury."

### The Cross-appeal

On its cross-appeal the Association complains of the district court's refusal to award it reimbursement for $48,704.32 spent by the Association for overhead expenses, which sum represented consignment fees of three cents per cwt. collected by the Association from warehousemen. The warehousemen in turn had collected such fees from the growers. The Association argues that the contracts contemplated that the use of such fees for overhead expenses would only be temporary, that the Association could recoup these sums out of the proceeds from the sale of the tobacco, and that if the sale proceeds were insufficient, the Association could recover these from Commodity.

We find no language in the contracts and no evidence of conduct of the parties supporting this contention. We hold that the district court was correct in refusing to allow a recovery against Commodity for these expenses.

The judgment of the district court with respect to the cross appeal is affirmed. In all other respects the judgment of the district court is reversed and the complaint is dismissed.