**HIATT GRAIN & FEED, INC., On Behalf of Itself and All Others Similarly Situated, Appellant,**

v.

**Robert S. BERGLAND, Secretary of Agriculture, United States of America, Appellee,**

**Ralph Ball et al., Intervenors.**

**No. 78–1170.**

United States Court of Appeals, Tenth Circuit.

Argued April 19, 1979.

Decided July 16, 1979.

Rehearing Denied Aug. 23, 1979.

William H. Curtis, of Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo. (Martin J. Purcell and John P. Owen, Kansas City, Mo., and John Q. Royce and Tom W. Hampton, of Hampton, Royce, Engleman & Nelson, Salina, Kan., with him on the brief), for appellant.

John F. Cordes, Atty., App. Staff, Civil Div. Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., James P. Buchele, U. S. Atty., Topeka, Kan., and Ronald R. Glancz, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for appellee.

Leonard O. Thomas, Kansas City, Kan., of Weeks, Thomas, Lysaught, Bingham & Mustain, Kansas City, Kan. (John A. Price, Kansas City, Kan., and Robert L. Gowdy, Kansas City, Mo., with him on the brief), for intervenors.

Before SETH, Chief Judge, and DOYLE and LOGAN, Circuit Judges.

SETH, Chief Judge.

This is a class action commenced by Hiatt Grain & Feed, Inc. against the Secretary of Agriculture. The complaint alleges that certain regulations promulgated by the Secretary were without statutory authority. These regulations, as amendments to 7 C.F.R. §§ 1421 and 1425, authorized price support loans to marketing cooperatives on wheat and feed grains.

The trial court found the regulations to be within the authority of the Secretary and to have been adopted in accordance with the required procedure.

The plaintiff has taken this appeal urging that the trial court's conclusion was erroneous.

The challenged amendments to 7 C.F.R. §§ 1421 and 1425 provided expressly that price support loans, Form G loans, could be made to approved cooperative marketing associations on wheat, corn, barley, sorghum, oats, and rye. Previous regulations permitted such loans to cooperatives on many other crops. These crops included rice, dry beans, dry peas, cotton, tobacco, wool, soybeans, and others.

The challenged regulation provides in part that a cooperative marketing association which is approved by the CCC may obtain price support loans on "eligible warehouse stored production of such crop of the commodity on behalf of its members." The regulations provide for loans when the commodity is pooled if it is all eligible for support, and the product is from "eligible" members.

The record shows that the title to the grain in the marketing cooperative's pool or otherwise in its control has passed from the grower to the cooperative, and the cooperative makes all the market decisions. The regulations provide that loan proceeds be remitted to the pool members within fifteen days of receipt. 7 C.F.R. § 1425.14(a). Before the regulations, growers who placed their wheat in the cooperative's pool were not eligible for price support loans on such

grain because title to it had passed to the cooperative.

The price support loans provided for in the regulations are like other such loans in that the CCC has recourse only against the grain pledged, and has no right of action on the loan against the borrower.

As indicated, the fundamental issue on appeal is whether the Secretary had statutory authority to permit the making of price support loans on wheat and feed grains to cooperatives.

The trial court held that the Secretary had such authority. *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457 (D.Kan.). The court found an overall statutory authority to use cooperatives in the price support program, and that the procedure used in the adoption of the regulations was proper.

We need not here describe the CCC loan program nor the grain marketing methods. The facts are described in the opinion of the trial court.

The dispute centers on 7 U.S.C. § 1441, which reads in part:

"The Secretary of Agriculture (hereinafter called the 'Secretary') is authorized and directed to make available through loans, purchases, or other operations, price support to cooperators for any crop of any basic agricultural commodity, . . . ."

7 U.S.C. § 1421 reads in part:

"(a) The Secretary shall provide the price support authorized or required herein through the Commodity Credit Corporation and other means available to him.

"(b) Except as otherwise provided in this Act, the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out, shall be determined or approved by the Secretary. . . . ."

The plaintiff urges that 7 U.S.C. § 1441 is the only source of the Secretary's authority and it provides for loans to "cooperators." Further, it argues that a "cooperator" as used in this section means a "producer." 7 U.S.C. § 1428(b). Thus plaintiff's basic position is that the statute provides for loans only to producers. All the parties agree that the cooperatives here concerned are not "cooperators" and are not "producers" under section 1441.

■ The plaintiff further urges that 15 U.S.C. § 713a–13 in its direction to the Secretary to use established trade channels and instrumentalities *prohibits* the authorization of loans to cooperatives.

We must agree with the conclusion reached by the trial court, and with much of its analysis.

It is apparent from the many statutory provisions and congressional committee reports over the years that Congress has intended and insisted that cooperatives be encouraged by the Secretary, and be utilized in the implementation of the farm program generally. There is also the direction that the Secretary carry out the price support program through the CCC and "other means," 7 U.S.C. § 1421(a); that the Secretary "make available" through loans or "other operations" price supports to producers, 7 U.S.C. § 1441. The Marketing Act of 1933, 12 U.S.C. § 1141, provides for the encouragement of the organization of producers into cooperatives to assist the marketing of their products. Also, as we have seen, other regulations provide for price support loans, Form G loans, to cooperatives on other farm products.

As quoted above, 7 U.S.C. § 1441 provides in part that the Secretary is "directed" to "make available" price support to "cooperators" (producers). Some significance must be attached to the "make available" language in the statute. It is obviously broader than would be *loans to* cooperators, and it is also provided in the same sentence of the statute that price supports be made available through loans "or other operations." Again "other operations" is much broader than *loans to*. We must consider these elements in the context of the other statutory provisions relating to the use and encouragement of cooperatives, and the general authority of the Secretary in 7 U.S.C. § 1421(a) to use price supports. This

construction is not contrary to 15 U.S.C. § 714j, which provides yet additional means and which should not be considered as exclusive as there is nothing whatever to so indicate. See also "other means" in 7 U.S.C. § 1421(a), by which the Secretary may use price support loans.

The intervenor and the Secretary have advanced the argument that the cooperatives are receiving the loan funds "on behalf" of the producers, as the regulation recites. This, they urge, with the requirement that the loan funds be remitted to the producers within fifteen days (less costs of about 45 cents per bushel) makes the cooperative a conduit for the loan and proceeds. This argument has some merit and relates to the "on behalf" position. However, we are struck by the many layers of cooperatives that the record shows to be placed between the producer and the marketing of the grain. There are cooperatives, such as Farmland, which control other cooperatives as FAR–MAR–CO, which in turn operates for some members its ProMark wheat pool. There are also cooperatives and other members which apparently belong to Farmland or to other cooperatives which belong to Farmland. Thus when we look at the organizations between the individual and the marketing decision, it is obvious that the dilution of the individual's position is very, very great. The wheat pool members are but a portion of the FAR–MAR–CO membership. This is of some concern in this decision insofar as it is based on the direction by Congress to "make available" price supports *to producers*. One must accept in full the theory that each cooperative in each layer is an aggregation of producers (although also a separate entity) as this is what Congress has accepted. The "dilution" is a matter for Congress and not for this court. There is some doubt in our view whether FAR–MAR–CO is really a cooperative in view of its capital structure, but this point is not litigated and we accept the trial court's conclusion. Also we must assume that the Secretary will enforce its regulations which require that majority ownership of the pooling cooperative be "in active producer members and any bona fide coop-

erative member." Sections 1425.4 and 1425.15. See also as to the source of the pool grain, section 1425.11. With this assumption, the construction of section 1441 adopted by the trial court and the "make available" language by a realistic construction leads to the conclusion that the authorization of loans to cooperatives is within the authority of the Secretary. There is no express authority. The plaintiff in its brief states that the Secretary "essentially admits that there are no statutory provisions . . . anywhere specifically authorizing price support loans to cooperatives." This is so, and we find no specific authority. If there was such, we would not have this litigation.

We do not view the marketing cooperatives as anything but entities separate from their members. They are thus each a business entity recognized by law, but operating by a consensus of its members. The "qualified" cooperatives here concerned are defined in the regulations. 7 C.F.R. §§ 1425.4, 1425.5. In our view the statutes provide authority for the Secretary to direct that price support loans be made to such entities if the structure is approved. See our assumption, expressed above as to "approved" cooperatives. Section 1425.4. This position does not compel a result under 7 U.S.C. § 1441 different from that outlined above. Our construction of section 1441 in the setting of the congressional direction to the Secretary as to cooperatives and as to support payments accommodates the separate entity view coupled with member control. The congressional directions to administrative agencies are in a variety of forms and degrees of specificity. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492; *American Trucking Ass'ns, Inc. v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337.

We have considered plaintiff's argument based on the directions in 15 U.S.C. § 713a–13 to the Secretary to use customary marketing machinery, and to encourage cooperative and noncooperative trade channels.

It is obvious that with loans to cooperatives on grain in their pools, they have become a factor in the international marketing of wheat. They so compete, as with their domestic marketing, with the private grain dealers. The plaintiff urges that with the availability of nonrecourse price support loans to cooperatives, the private dealers will be placed at a great disadvantage as to the cost of money. The record demonstrates that under some circumstances, the price support loans may provide some advantage in this respect to the cooperatives over the private dealers. However, we find nothing in 15 U.S.C. § 713a–13 which would prohibit such loans as urged by the plaintiff, nor would the competitive impact be a violation of plaintiff's constitutional rights as it urges. We have considered in this context the interest rates available to private dealers and to the cooperatives as well as the recourse and nonrecourse aspects. 7 U.S.C. § 1425.

We have mentioned at the outset the price support loans to cooperatives on farm products other than wheat and feed grains. As also mentioned, the regulations here challenged were an amendment to add wheat and feed grains to such group of products. The authority of the Secretary as to the original group of farm products is basically the same as for wheat, although there are some differences, and some arrangements have agency aspects with fees. Under these circumstances it is reasonable to consider, despite some variations, the regulations as to other products as a construction of the Secretary's statutory authority. Thus to consider the many authorities relating to statutory construction by a governmental agency, we have not made a complete list of these other products, but they include cotton in 1949 (13 Fed.Reg. 4338, an agency arrangement), peanuts in 1953 (13 Fed.Reg. 3778), rice in 1948 (13 Fed.Reg. 5109), soybeans in 1961 (26 Fed. Reg. 7317), all without rulemaking procedure. We mention again the "other means" language in section 1441, that is other than loans, to mean the use of other instrumentalities in the mechanics of loans to producers, but also, and more importantly, by usage to permit loans *to* cooperatives. We understand these are Form G loans for the most part of the type here considered for wheat.

We have considered the variations in the programs and regulations as to other products well described in plaintiff's brief (pp. 37–42). There are obvious differences, but considering them all, and the basic policy in authorizing the loans to such cooperatives, we still must view them as a significant construction or position as to statutory authority. The consistent and continuous review by Congress of farm policy and the administration of farm programs is sufficient to demonstrate an awareness by Congress of the practice as to these very important commodities over the extended period of time.

This court on many occasions has considered the weight to be given the construction of statutes by the administrative body charged with carrying out the directives in the Act. These cases include *Save Our Invaluable Land (Soil), Inc. v. Needham,* 542 F.2d 539 (10th Cir.); *American Petroleum Institute v. E.P.A.,* 540 F.2d 1023 (10th Cir.); *United States v. State of New Mexico,* 536 F.2d 1324 (10th Cir.), and *Lincoln Bank & Trust Co. v. Exchange Nat'l Bank,* 383 F.2d 694 (10th Cir.). In *United States v. State of New Mexico,* we said: "When construing a statute the courts may give great weight to the interpretation placed on the statute by those charged with its administration. (Citing *Zemel v. Rusk,* 381 U.S. 1, [85 S.Ct. 1271, 14 L.Ed.2d 179] and *Udall v. Tallman,* 380 U.S. 1, [85 S.Ct. 792, 13 L.Ed.2d 616])." We thus have a clear interpretation demonstrated by parallel programs, and this is sufficient.

Again in view of the continuous review of farm policy and the administration of the farm programs, the references in the record to congressional committee hearings is a sufficient demonstration of the awareness of Congress as to the support loan program for cooperatives, and the interpretation by the Secretary.

934

We have carefully considered *Tennessee Burley Tobacco Growers Ass'n v. Commodity Credit Corp.*, 350 F.2d 34 (6th Cir.), cited by the plaintiff; also *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117, and *Securities & Exchange Comm'n v. Sloan*, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148. *SEC v. Sloan* is a very significant case and is another demonstrating that administrative interpretation may be wrong, and must be set aside. The courts are the final authority on issues of statutory construction. *Federal Trade Comm'n v. Colgate-Palmolive Co.*, 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904. This is why the administration interpretation is "persuasive" or "entitled to weight." It is, of course, never conclusive as the Court reminds us in *SEC v. Sloan.* Considering these admonitions we again must give the interpretation weight; we find it consistent with a reasonable interpretation, not inconsistent with a statutory mandate, and does not frustrate congressional policy underlying the statute.

The plaintiff has also challenged the procedure followed in the adoption of the regulation here considered. We find no defects in the procedure. The record demonstrates a reasoned decision after consideration of all relative factors. There was a detailed economic analysis, an impact statement, and the rulemaking procedure under the Administrative Procedure Act was followed. There were some five thousand comments submitted, and the record shows that these were examined by the Department and their analysis was considered by the Secretary.

AFFIRMED.