**TEXAS PEANUT PRODUCERS BOARD, Etc., et al., Plaintiffs-Appellants,**

v.

**The UNITED STATES of America, Defendant-Appellee.**

**No. 80–1619.**

United States Court of Appeals, Fifth Circuit.
Unit A

June 30, 1981.

Goins & Underkofler, Harold E. Vanberg, Jr., Dallas, Tex., for plaintiffs-appellants.

Charles D. Cabaniss, Dallas, Tex., Raymond W. Fullerton, Asst. General Counsel, U.S. Dept. of Agriculture, Washington, D.C., for defendant-appellee.

Before CHARLES CLARK and GEE, Circuit Judges, and SPEARS,* District Judge.

CHARLES CLARK, Circuit Judge:

Texas peanut farmers brought this appeal, charging that the Secretary of Agriculture paid them less for their 1973 to 1977 peanut crops than the minimum amount required by federal price support legislation by requiring the farmers to bear handling, storage, and inspection costs for peanuts ultimately purchased by the government. We hold that the imposition of such costs did not reduce the price support below the minimum fixed by law, and we affirm the judgment of the district court.

I.

The Agricultural Act of 1949, 7 U.S.C. § 1441(b), guarantees peanut farmers a minimum price for peanuts they sell to the government. The minimum price varies under a formula enacted by Congress, but under no circumstances may farmers receive less than 75 percent of the so-called "parity" price. Farmers can participate in the price support program in three ways: (1) by selling their peanuts directly to the government, (2) by storing their crop on the farm and selling to the government only if market prices are unfavorable, or (3) by storing the peanuts at a cooperative association which markets the peanuts or sells them to the government on behalf of a large number of farmers. The farmers in this case, like most of their colleagues throughout the nation, chose the third alternative. Their cooperative is the Southwestern Peanut Growers Association, or SWPGA.

The price support program operates through a system of loans. As farmers deliver their peanuts to the SWPGA, the association pays the farmers at the prevailing price support rate. The SWPGA then receives a loan from the Commodity Credit Corporation (CCC), a creature of the Department of Agriculture, in an amount corresponding to the price support rate for all peanuts held by the association. The peanuts are pledged as collateral against the loan, but title to the peanuts remains in the SWPGA and it can sell them on the open market if it chooses to do so. If market conditions are unfavorable, the association can forfeit the peanuts to the CCC in full repayment of the loan. Even after the association has agreed to forfeit the peanuts, however, transfer of title and physical delivery to the government occur only on the CCC's demand. Thus, handling, storage, and inspection costs after forfeiture accrue largely at the will of the CCC.

During the 1973 to 1977 period at issue in this litigation, the price support rate was at the minimum 75 percent of parity.[1] Beginning in 1973, the Department of Agriculture directed the SWPGA to deduct an amount representing estimated handling, storage, and inspection costs from the amount paid to farmers when they delivered their peanuts to the association. This deduction reduced the price support received by individual farmers to approximately 71.6 percent of parity.[2] The handling, storage, and inspection costs deductions made in 1973 were the first since 1960, but similar deductions had been made during the first nine years of the price support program. During that period, however, the price support rate was at the 75 percent minimum only once, in 1959.

The farmers filed a class action in the district court, seeking reimbursement for the costs that were deducted in the 1973–1977 period. The trial judge granted summary judgment for the Government, ruling that the Secretary had "no statutory or

---

* District Judge of the Western District of Texas, sitting by designation.

1. In 1977, Congress made substantial changes in the peanut price support system. The new legislation prohibits the deduction of handling, storage, and inspection costs. See 7 U.S.C. § 1445c(a) (Supp.1977). By its own terms, however, the new legislation expires with the 1981 peanut crop. Id. § 1445c.

2. The SWPGA deducted an additional 50 cents per ton to fund the association's local activities. These deductions were made with the voluntary assent of the farmers and are not challenged in this litigation.

contractual obligation to pay the [handling, storage, and inspection] expenses of the producer association."

## II.

The Secretary concedes that the statute establishes a minimum price support level of 75 percent of parity. He also admits that individual farmers received a net payment which equaled only 71.6 percent of parity for the 1973–1977 peanut crops. In his view, however, the SWPGA is an agent of the farmers. The Secretary argues that he complied with the statute by paying 75 percent of parity to the SWPGA.

The farmers deny that a 75 percent payment to the SWPGA is equivalent to a 75 percent payment to the farmers. In their view, the SWPGA is an agent of the government. As they point out, the association is devoted almost entirely to procuring federal price support and is recognized for this purpose by Department of Agriculture regulations. See 7 C.F.R. § 1446.-4(b)(2). Moreover, according to the farmers, federal law limits the activities of the association. The farmers assert that the SWPGA can sell its peanuts only as permitted by 7 U.S.C. section 1427, which prescribes minimum prices and other restrictions for the sale of peanuts "owned or controlled" by the CCC. Thus, the farmers argued that the association acts on behalf of the Secretary as a conduit for price support.

The issue then is whether the SWPGA can be considered the farmers' representative for purposes of receiving price support payments. The statute itself sheds little light to aid our decision. Section 1441 directs the Secretary to "make available . . . price support to cooperators." Under section 1428(b), "cooperators" are defined as "producers" whose farms comply with certain guidelines established by federal legislation. While the term "cooperator" does seem to refer to an individual farmer, the Secretary is not directed to *pay* price support to the cooperator, he need only *make* price support *available*. The deduction of handling, storage, and inspection expenses,

like other potential conditions imposed by the Secretary, is not incompatible with the duty to make price support available. *See Hiatt Grain & Feed, Inc. v. Bergland*, 602 F.2d 929, 931–32 (10th Cir. 1979).

The relationship between the farmers, the SWPGA, and the CCC is governed by the contractual agreements between the parties. *Tennessee Burley Tobacco Growers' Ass'n v. Commodity Credit Corp.*, 350 F.2d 34, 43 (6th Cir. 1965). These documents make clear that the SWPGA is the farmers' representative. Each farmer signs a receipt when he delivers his peanuts to the association. By signing the receipt, the farmer agrees to "appoint the Southwestern Peanut Growers' Association as [his] agent to handle and market such peanuts and to pledge them as security for price support loan." Paragraph 5 of the agreement between the SWPGA and the CCC provides that "[i]n its operations under Part I of the agreement [the part providing for price support loans], the Association shall act on behalf of producers of eligible peanuts." Thus, both the farmers' agreement with the SWPGA and the SWPGA's agreement with the CCC provide that the association acts for the farmers in receiving price support payments. Moreover, the SWPGA is owned and controlled by the farmers.

The farmers have exaggerated the SWPGA's dependence on the federal government. While the association is subject to some restrictions in the disposition of its peanuts, these restrictions arise, not from the association's status as a governmental entity, but from the contractual relationship between the SWPGA and the CCC. It is clear, for example, that 7 U.S.C. section 1427 has no application to SWPGA peanuts prior to forfeiture to the CCC. Paragraph 14(b) of the agreement between the SWPGA and the CCC provides that "[t]he Association may, at any time prior to the maturity date of the loan, redeem all, but not part of, the remaining loan collateral peanuts." Prior to forfeiture, the SWPGA can sell its peanuts on the open market and distribute any profit to its members. Thus, the peanuts are not

"owned or controlled" by the CCC, and are not subject to section 1427, until after they are forfeited by the association. The farmers also object that paragraph 14(b) itself unduly restricts the association's freedom. They complain that the provision permitting the association to redeem "all, but not part of," its peanuts is incompatible with independent marketing and is a sign of the SWPGA's public character. To the contrary, this restriction appears to be no more than a customary protection for a lender's position with regard to collateral of this type. Government counsel suggested at oral argument that the provision was intended to prevent an association from marketing its high-grade peanuts and forfeiting less desirable grades to the government. A contractual obligation of this nature does not convert the association into an agency of the Department of Agriculture.

The farmers cite *Tennessee Burley Tobacco Growers' Ass'n v. Commodity Credit Corp.*, 350 F.2d 34, 42–43 (6th Cir. 1965), for the proposition that the SWPGA is not a producer under the statute, and thus cannot be considered the farmers' agent for receiving price support payments. We do not read *Tennessee Burley* to hold that an association is unlike a producer for all purposes. *Tennessee Burley* held that a tobacco growers' association was not a producer within the meaning of 7 U.S.C. section 1425, which insulates "producers" from liability to the CCC. *See* 350 F.2d at 42–43. According to the Sixth Circuit, section 1425 was designed to protect individual farmers from liability, and could not be used by the association to defeat its contractual obligations to the CCC. Rather than being to the contrary, this holding fits hand in glove with our view that the farmers agreed by contract to appoint the SWPGA as their agent. *Tennessee Burley* does include dicta to the effect that each farmer should receive the full price support payment. However, the primary holding of the case—that the rights of the parties are determined by their contractual relationship—is fully consistent with our disposition of the case before us.

The farmers also argue that it is unfair to make them pay handling, storage, and inspection costs which accrue at the will of the CCC. The short answer to this argument is that the farmers were free to choose one of the two other price support programs under which they could completely control (and pay for) their handling, storage, and inspection expenses. Other arguments raised by the farmers—that the cost deduction is an unconstitutional tax, for example—are insubstantial. Accordingly, we hold that a payment to the SWPGA of 75 percent of parity fulfilled the Secretary's statutory obligations, and that the Secretary could require the association to deduct handling, storage, and inspections costs from the amount paid to individual farmers.

AFFIRMED.